*Commonwealth of Massachusetts*
# MIDDLESEX SUPERIOR COURT DEPARTMENT
## THE TRIAL COURT
## WOBURN

18-2831

I, C. Andrew Johnson, Deputy Assistant Clerk of the Superior Court, Within and for said County of Middlesex, do certify that the annexed papers are true copies made by photographic process of pleadings in 18-2831 entered in the Superior Court on the 2 day of OCT in the year of our Lord 2018.

In testimony whereof, I hereunto set my hand and affix seal of said Middlesex Superior Court at Woburn in said County, this 8 day of NOV, in the year of our Lord **Two Thousand Eighteen**.



C. Andrew Johnson
Deputy Assistant Clerk

| CIVIL TRACKING ORDER (STANDING ORDER 1-88) | DOCKET NUMBER 1881CV02831 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| CASE NAME: Andrew S Conning vs. Jack Halpern et al | | Michael A. Sullivan, Clerk of Court Middlesex County |
|---|---|---|
| TO: Kenneth Robert Leopold Parker, Esq. Parker Keough LLP 51 Winchester St Suite 205 Newton Highlands, MA 02461 | | COURT NAME & ADDRESS Middlesex County Superior Court – Woburn 200 Trade Center Woburn, MA 01801 |

## TRACKING ORDER - X - Accelerated

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

### STAGES OF LITIGATION                              DEADLINE

| | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court | | 12/31/2018 | |
| Response to the complaint filed (also see MRCP 12) | | 10/02/2019 | |
| All motions under MRCP 12, 19, and 20 | | | |
| All motions under MRCP 15 | | | |
| All discovery requests **and depositions** served and non-expert depositions completed | | | |
| All motions under MRCP 56 | | | |
| Final pre-trial conference held and/or firm trial date set | | | |
| Case shall be resolved and judgment shall issue by | | | |

**The final pre-trial deadline is not the scheduled date of the conference.** You will be notified of that date at a later time.

**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

This case is assigned to

| DATE ISSUED 10/02/2018 | ASSISTANT CLERK Dia S Roberts-Tyler | PHONE (781)939-2772 |
|---|---|---|

**CIVIL ACTION COVER SHEET**

DOCKET NUMBER
18-2831

**Trial Court of Massachusetts
The Superior Court**

| | |
|---|---|
| PLAINTIFF(S): Andrew Scott Conning | COUNTY Middlesex |
| ADDRESS: 3263 Vineyard Avenue | |
| Space 100 | DEFENDANT(S): Jack Halpern; and |
| Pleasanton, CA 94566 | CJK Dictionary Institute, Inc. |
| ATTORNEY: Kenneth R. L. Parker; Shaun P. Keough; Nathaniel J. Lichtin | |
| ADDRESS: 51 Winchester Street | ADDRESS: Komine Building |
| Suite 205 | 34-14, 2-chome, Tohoku, Niiza-shi |
| Newton, MA 02461 | Saitama 352-0001, Japan |
| BBO: Kenneth Parker 688987 Shaun Keough 688868 Nathaniel Lichtin 692767 | |

**TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)**

| CODE NO. B15 E05 | TYPE OF ACTION (specify) Defamation | TRACK A | HAS A JURY CLAIM BEEN MADE? ☒ YES   ☐ NO |
|---|---|---|---|
| *If "Other" please describe: | BE1 (Business Torts) Track: A; D09 (Interference in contractual relationship) Track: F; BH1 (c. 93A) Track: A; E05 (Confirmation of Award) Track: X |

*called*

**STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A**

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**
(attach additional sheets as necessary)

A. Documented medical expenses to date:
    1. Total hospital expenses ................................................ $ _____
    2. Total doctor expenses ................................................. $ _____
    3. Total chiropractic expenses ........................................ $ _____
    4. Total physical therapy expenses ................................. $ _____
    5. Total other expenses (describe below) ....................... $ _____
    Subtotal (A): $ _____

B. Documented lost wages and compensation to date ............................... $ 9,600
C. Documented property damages to dated ............................................... $ _____
D. Reasonably anticipated future medical and hospital expenses ............... $ _____
E. Reasonably anticipated lost wages ..................................................... $ _____
F. Other documented items of damages (describe below) ........................ $ 236,621.91
    lost profits to date (including estimated lost profits due to Defendants' conduct); unpaid portion of an arbitration award

G. Briefly describe plaintiff's injury, including the nature and extent of injury:
Mental anguish and tarnished reputation; estimated lost profits; estimated lost wages; and unpaid arbitration award.

The mental anguish and tarnished reputation damages to be determined at trial.

TOTAL (A-F):$ 246,221.91

**CONTRACT CLAIMS**
(attach additional sheets as necessary)

Provide a detailed description of claims(s):

TOTAL: $ _____

Signature of Attorney/Pro Se Plaintiff: X _____ Date: Sep 28, 2018

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

**CERTIFICATION PURSUANT TO SJC RULE 1:18**
I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney of Record: X _____ Date: Sep 28, 2018

*(stamp)* FILED IN THE OFFICE OF THE CLERK OF COURTS FOR THE COUNTY OF MIDDLESEX OCT 0 2 2018 CLERK

3

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

MIDDLESEX SUPERIOR COURT
C.A. NO. : _____

18-2831

ANDREW SCOTT CONNING
      Plaintiff,

    v.

JACK HALPERN and CJK DICTIONARY INSTITUTE,
INC.
      Defendants.

**HEARING REQUESTED
PURSUANT TO MASS. R.
CIV. P. 4.2**

FILED
IN THE OFFICE OF THE
CLERK OF COURTS
FOR THE COUNTY OF MIDDLESEX

OCT 0 2 2018

CLERK

## MOTION FOR APPROVAL OF ATTACHMENT ON TRUSTEE PROCESS OF FUNDS HELD BY GOOGLE LLC AND APPLE INC.

    Pursuant to Rule 4.2 of the Massachusetts Rules of Civil Procedure, the Plaintiff Andrew

Scott Conning hereby respectfully requests the Court's approval of attachment on trustee process

of funds, deposits, or credits of the Defendants in the amount of $30,808.78 plus any applicable

pre-judgment interest,[1] now in the control or possession of Apple Inc. of 1 Infinite Loop MS: 38-

3TX, Cupertino, CA, 95014, a trustee, and Google LLC of 1600 Amphitheatre Pkwy, Mountain

View, CA, 94043, a trustee. The trustees both have a usual place of business in the

Commonwealth, and have sufficient contacts with the Commonwealth to justify this trustee

process action against them.

---

[1] Pursuant to M.G.L. c. 231, §§ 6B and 6H.

*Page 1 of 2*

A hearing is requested pursuant to Rule 4.2(c). The Plaintiff respectfully requests a hearing date as soon as possible for inclusion in a notice of hearing to be served on the Defendants in accordance with Rule 4.2(c).

Once approved, the Plaintiff respectfully requests the issuance of two trustee summonses to be served on the respective trustees in accordance with Rule 4.2(c).

An affidavit in support of this motion is attached hereto.

DATED: September 28, 2018

Respectfully submitted,
Plaintiff
Andrew Scott Conning,
By his attorneys,

Kenneth R. L. Parker (BBO #688987)
Shaun P. Keough (BBO #688868)
Nathaniel J. Lichtin (BBO #692764)
PARKER KEOUGH LLP
*Street Address:*
  51 Winchester St., Suite 205
  Newton, MA 02461
*Mailing Address:*
  P.O. Box 590006
  Newton, MA 02459
Tel.: (617) 841-2418
Fax.: (617) 963-8315
E-mail: kparker@parkerkeough.com

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                                MIDDLESEX SUPERIOR COURT
                                              C.A. NO. : _____

18-2831

ANDREW SCOTT CONNING
        Plaintiff,

        v.

JACK HALPERN and CJK DICTIONARY INSTITUTE,
INC.
        Defendants.



FILED
IN THE OFFICE OF THE
CLERK OF COURTS
FOR THE COUNTY OF MIDDLESEX

OCT 02 2018

CLERK

## PLAINTIFF'S AFFIDAVIT IN SUPPORT OF MOTION FOR APPROVAL OF ATTACHMENT ON TRUSTEE PROCESS OF FUNDS HELD BY GOOGLE LLC AND APPLE INC.

I, Andrew Scott Conning, plaintiff in the above-referenced action, say of my own

knowledge, in support of this motion that:

1.  This is a civil action for, among other things, recognition, confirmation, and enforcement

    of an arbitral award I obtained against the Defendant CJK Dictionary Institute, Inc.

    ("**CJKI**") through arbitration proceedings before the Japan Commercial Arbitration

    Association. See **Exhibit A** attached to the Complaint and Jury Demand; Request to

    Recognize, Confirm, and Enforce Foreign Arbitration Award Pursuant to 9 U.S.C. §§ 201

    & 207 and M.G.L. c. 251, §§ 11 & 14 filed in this action (the "**Final Award**").

2.  To the extent this is an action "upon a judgment," no bond is required. However, if the

    Court finds that a bond is required, I am prepared to procure a bond in an amount the

*Page 1 of 3*

Court orders, and shall file said bond with the Court before serving on the trustees any issued trustee summonses.

3.   Upon information and belief, there are presently monies or credits due said Defendants in the control and possession of the trustee, Apple Inc., and the trustee, Google LLC Specifically, Apple Inc. and Google LLC both hold assets of Defendant CJKI, which both regularly distribute to CJKI in the form of royalty payments based on sales of CJKI's software through the Apple App Store and Google Play Store.

4.   Both Apple Inc. and Google LLC are registered foreign business entities operating within the Commonwealth of Massachusetts, as indicated on the corporate database maintained by the Secretary of the Commonwealth of Massachusetts.

5.   Apple Inc.'s resident agent in the Commonwealth of Massachusetts is CT Corporation System with a principal place of business at 155 Federal Street Ste 700, Boston, Massachusetts, 02110, as indicated on the corporate database maintained by the Secretary of the Commonwealth of Massachusetts.

6.   Upon information and belief, Apple Inc. maintains a Massachusetts office at 111 Huntington Avenue, Floor 5, Boston, Massachusetts, 02199.

7.   Apple Inc. has several Apple Stores in the Commonwealth of Massachusetts, including four stores in Middlesex County: (1) 100 Cambridgeside Place, Cambridge, Massachusetts, 02141; (2) 199 Boylston Street, Chestnut Hill, Massachusetts, 02467; (3) 75 Middlesex Turnpike, Burlington, Massachusetts, 01803; and (4) 1245 Worcester Street, Natick, Massachusetts, 01760.

8.   Google LLC's resident agent in the Commonwealth of Massachusetts is Corporation Service Company with a principal place of business at 84 State Street, Boston,

Massachusetts, 02109, as indicated on the corporate database maintained by the Secretary of the Commonwealth of Massachusetts.

9. Google also has an office at 355 Main Street, Cambridge, Massachusetts 02142 called the "Google Cambridge Campus."

10. Upon information and belief, both trustees receive substantial revenue from transactions that take place within the Commonwealth of Massachusetts, in the nature of software and hardware sales.

11. I have a meritorious cause of action and there is a reasonable likelihood that a judgment will enter on the Final Award, in the amount of $30,861.91 plus any applicable pre-judgment interest.

12. I certify that I know of no liability insurance available to satisfy any judgment that may be obtained.

13. I know of no other assets of the Defendants available to satisfy any judgment.

14. The Defendants have refused to pay me the entire Final Award despite my reliance on their promises to pay over the course of the past 19 months.

15. To the extent statements in this affidavit are based upon information and belief, I believe the information upon which such statements are based to be true.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 28th DAY OF SEPTEMBER, 2018.

Andrew Scott Conning

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

MIDDLESEX SUPERIOR COURT
C.A. NO. : 18-2831

---

ANDREW SCOTT CONNING
　　　Plaintiff,

v.

JACK HALPERN and CJK DICTIONARY INSTITUTE,
INC.
　　　Defendants.

FILED
IN THE OFFICE OF THE
CLERK OF COURTS
FOR THE COUNTY OF MIDDLESEX

OCT 0 2 2018

CLERK

---

## COMPLAINT AND JURY DEMAND; REQUEST TO RECOGNIZE, CONFIRM, AND ENFORCE FOREIGN ARBITRATION AWARD PURSUANT TO 9 U.S.C. §§ 201 & 207 AND M.G.L. c. 251, §§ 11 & 14

Andrew Scott Conning ("**Mr. Conning**" or "**Plaintiff**") brings this complaint against

Jack Halpern ("**Mr. Halpern**") and the CJK Dictionary Institute, Inc. ("**CJKI**") (collectively, the

"**Defendants**") for damages, injunctive relief, costs, and attorneys' fees based on the Defendants'

defamatory statements, tortious interference with contractual and advantageous business

relationships, and violations of M.G.L. c. 93A. In addition, Plaintiff respectfully requests that the

Court confirm and enforce Plaintiff's arbitration award against the Defendants pursuant to 9

U.S.C. §§ 201 & 207 (the Federal Arbitration Act) and M.G.L. c. 251, §§ 11 & 14 (the

Massachusetts Arbitration Act), a true and accurate copy of the arbitration decision and award

(the "**Final Award**") attached hereto as **Exhibit A**.

## PARTIES

1.  Plaintiff Andrew Scott Conning is an individual who at all relevant times resided in

    Massachusetts, and who currently temporarily resides at 3263 Vineyard Avenue, Space

    100, Pleasanton, CA, 94566.

2.  Defendant Jack Halpern is a permanent resident of Japan and, upon information and

    belief, is the sole owner and Chief Executive Officer of Defendant CJKI.

3.  Upon information and belief, CJKI does not have any other executive officers.

4.  Defendant CJK Dictionary Institute, Inc. is a Japanese corporation which has its principal

    place of business at Komine Building, 2-chome, 34-14, Tohoku, Niiza-shi, Saitama 352-

    0001, Japan.

5.  Upon information and belief, Mr. Halpern commingles his personal funds with CJKI's

    funds.

6.  The actions and omissions of Mr. Halpern that he purports to take on behalf of CJKI are,

    for all intents and purposes, actions of Mr. Halpern in his individual capacity. For

    example, Mr. Halpern's threat to Mr. Conning that he could disrupt Mr. Conning's

    relationship with KUI was based on Mr. Halpern's personal relationship with KUI and

    expressly invoked that relationship.

## JURISDICTION AND VENUE

7.  The Massachusetts Superior Court has jurisdiction over this action pursuant to G.L. c.

    223A, § 3 and G.L. c. 214, § 1. The damages sought by Mr. Conning exceed $25,000,

    exclusive of interest and costs.

8.  The Court has personal jurisdiction over the Defendants because (a) the claims at bar

    relate to the Defendants' business transactions in the Commonwealth and (b) the acts and

    omissions that give rise to the claims that have caused tortious injury to Mr. Conning in

the Commonwealth. The Defendants have regularly done business within the Commonwealth through their transactions with the Plaintiff, including without limitation:

    a.  Defendant CJKI entered into a contract with Plaintiff on April 10, 2014 at which time Plaintiff was a resident of the Commonwealth and Defendants knew that Plaintiff was a resident of the Commonwealth;

    b.  Defendants engaged an attorney to seek a resolution to its dispute with the Plaintiff by holding meetings within the Commonwealth in September of 2015; and

    c.  Defendants filed an arbitration counterclaim against the Plaintiff on February 1, 2016, at which time Plaintiff was a resident of the Commonwealth and Defendants knew that Plaintiff was a resident of the Commonwealth.

9.    Defendant Mr. Halpern has regularly and extensively communicated with the Plaintiff since 2014 in the knowledge that the Plaintiff at all relevant times resided in the Commonwealth and communicated with Defendant from the Commonwealth.

10.    Defendants derive substantial revenue from goods and services sold to and used by individuals in the Commonwealth. For example, they sell a variety of software applications to residents and businesses of the Commonwealth through software marketplaces, including without limitation the Apple App Store and the Google Play Store.

11.    Defendants knew that Plaintiff intended to conduct and did in fact conduct his work pursuant to Defendant CJKI's contract with Plaintiff in the Commonwealth of Massachusetts.

12.    Personal jurisdiction over the Defendants is reasonable and does not offend traditional notions of fair play or substantial justice because, as alleged with more specificity herein,

Defendants' actions were made within, or purposely directed into, the Commonwealth causing harm to a Massachusetts citizen within the Commonwealth. Specifically, with respect to defamation, the defamatory statements alleged herein were intentionally and expressly aimed by the Defendants at Mr. Conning with full knowledge that he was residing in and conducting his business from the Commonwealth, resulting in harm to Mr. Conning in the Commonwealth. Therefore, Defendants knew this harm was likely to be suffered by Mr. Conning in the Commonwealth.

13. The Defendants had notice, and therefore it was foreseeable, that they could be haled into a Massachusetts court because, as alleged with more specificity herein, they voluntarily and knowingly entered into a business relationship and extensively communicated with Mr. Conning with the knowledge that he resided in Massachusetts, would conduct his part of the parties' business relationship in Massachusetts, and would experience the consequences of this relationship in Massachusetts. As such, the Defendants purposely availed themselves of the laws and protections of the Commonwealth, and the personal jurisdiction that comes along with it.

14. The court has jurisdiction to recognize, confirm, and enforce the Final Award, attached as **Exhibit A**, against the Defendants pursuant to 9 U.S.C. §§ 201 & 207 and M.G.L. c. 251, §§ 11 & 14.

15. Venue in this forum is proper pursuant to M.G.L. c. 223, § 1.

## STATEMENT OF FACTS

### The Consulting Agreement and the JCAA Arbitration

16. Mr. Conning and Defendant CJKI entered into a consulting agreement dated April 10, 2014 (the "**Consulting Agreement**").

17. Under the Consulting Agreement, Mr. Conning and CJKI agreed that (a) Mr. Conning would assist CJKI in the editing of the CJKI Chinese Learner's Dictionary ("**CCLD**"); (b) the Parties would collaborate in the development of an app that would adapt Mr. Conning's course for learners of Chinese characters (the "**HLC App**", sometimes referred to in correspondence as the "**iHLC**") and (c) the Parties would collaborate in the development of an app for Mr. Conning's course for learners of Sino-Japanese characters (the "**KLC App**", sometimes referred to in correspondence as the "**iKLC**", and, together with the HLC App, the "**Apps**").

18. The Consulting Agreement provided that disputes arising out of said agreement were subject to binding arbitration before the Japan Commercial Arbitration Association (the "**JCAA Arbitration**"). Mr. Conning requested such arbitration on December 21, 2015. The arbitration was formally opened in January 2016, and concluded on February 13, 2017 with the issuance of the Final Award.

19. The JCAA appointed a sole arbitrator as its Tribunal to arbitrate the dispute between Mr. Conning and CJKI (the "**JCAA Arbitrator**"). The JCAA Arbitrator ruled in the Final Award that CJKI had breached both the CCLD portion and the Apps portion of the Consulting Agreement.

20. The JCAA Arbitrator ruled in the Final Award that CJKI had inappropriately threatened Mr. Conning and withheld his compensation under the Consulting Agreement in an effort to force him to agree to an unfavorable amendment to the Consulting Agreement.

21. The JCAA Arbitrator ruled in the Final Award that CJKI had violated their explicit and implicit obligations to Mr. Conning.

22. The JCAA Arbitrator also determined that Mr. Conning's claims regarding both the CCLD portion and the Apps portion of the Consulting Agreement were valid and supported by the evidence, and that the counter-claims brought by CJKI were not valid or supported by the evidence.

23. The JCAA Arbitrator further ruled that Mr. Conning had successfully terminated the Consulting Agreement on March 1, 2016, due to CJKI's breach of contract.

24. The Final Award directs that "CJKI shall pay Mr. Conning the sum of $50,000, with interest thereon at the rate of 6% per annum from March 2, 2016, until the date of full payment thereof[.]"

25. The Final Award also directs that "CJKI shall pay Mr. Conning the sum of 1,779,718 Japanese yen in respect of costs of arbitration."

26. CJKI made three payments to Mr. Conning toward the Final Award in 2017, covering the 1,779,718 yen in arbitration costs plus $25,586.20 toward the compensatory portion of the Final Award, but has not made any payments since.

27. Specifically, CJKI paid (a) 2,500,000 Japanese yen on July 31, 2017; 1,779,718 yen of which was applied to pay the awarded arbitration costs in full and 720,282 yen of which was applied to the $50,000 award, which was $6,542.32 at that day's exchange rate; (b) 1,000,000 Japanese yen on August 5, 2017, which was $9,043.88 at the applicable exchange rate; and $10,000 on November 27, 2017.

28. At 6% per annum interest calculated based on the amounts and dates of the partial payments set forth above, $6,448.11 in interest on CJKI's debt to Mr. Conning has accumulated since March 2, 2016, specifically (a) $4,233.30 between March 2, 2016 and July 31, 2017; (b) $35.70 between July 31, 2017 and August 5, 2017; (c) $705.96

between August 5, 2017 and November 27, 2017; and (d) $1,473.15 between November 27, 2017 to September 28, 2018.

29. Accounting for interest and payments to date, CJKI now owes Mr. Conning $30,861.91.

30. Because the claims made in the present complaint (namely, defamation, tortious interference with contractual and advantageous business relationships, and violations of M.G.L. c. 93A) do not arise from the terms of the Consulting Agreement, they are not subject to JCAA Arbitration. The present claims pertain to actions taken by the Defendants unrelated to the terms of the Consulting Agreement, including actions taken by the Defendants since the JCAA Arbitration concluded. Because Mr. Conning cannot seek to remedy the harms to him set forth in these claims through further JCAA Arbitration, he must instead seek protection from a court of law in this jurisdiction.

### Coercive and Defamatory Conduct

31. Defendants attempted to coerce Mr. Conning into abandoning his right to compensation pursuant to the Consulting Agreement and the Final Award and to agree to an unfavorable amendment to the Consulting Agreement by (a) making false accusations against Mr. Conning to his publisher Kodansha USA, Inc. ("KUI"), including false accusations that Mr. Conning improperly used CJKI data and (b) causing KUI to cease distribution of Mr. Conning's book. Specifically, in or around December 2017 or January 2018, the Defendants falsely told KUI that the Plaintiff improperly used CJKI data in the Plaintiff's book entitled the *Kodansha Kanji Learner's Course: A Step-by-step Guide to Mastering 2300 Characters* ("KKLC," also sometimes referred to in correspondence as "KLC"). The Defendants also falsely told KUI that Mr. Conning no longer had

permission to use the foreword in the KKLC that Mr. Halpern wrote specifically for the KKLC in exchange for publicity and other consideration.

32. CJKI and Mr. Halpern granted Mr. Conning permission to use the foreword in the KKLC by writing the foreword and providing it to Mr. Conning's editor with the understanding that it would appear in the KKLC.

33. Upon information and belief, Defendants made the false statements referenced in Paragraph 31, above, both orally and in writing.

34. The Defendants knew that the statements referenced in Paragraph 31 above, were likely to harm the Plaintiff in his business relationship with KUI and in his ability to earn royalties from his book, and that these harms had the potential to generate pressure that could help the Defendants avoid paying compensation owed to the Plaintiff.

35. The Defendants' false statements to KUI included the assertion that Mr. Conning had made unauthorized use of CJKI's Japanese kanji character data, including (a) entry numbers, (b) character readings, (c) character meanings, (d) radicals, (e) radical numbers, (f) stroke counts, (g) a readings index, and (h) a list of "similar characters" (collectively, the **"Kanji Character Data"**).

36. CJKI and Mr. Halpern granted Mr. Conning permission to use the Kanji Character Data in the KKLC to the extent that any such permission was necessary, much of the Kanji Character Data not being subject to copyright.

37. The Defendants knew that their accusations concerning Mr. Conning's use of the Kanji Character Data were false when made, or at the very least made the allegations with a reckless disregard as to their truth. In fact, the Defendants had previously acknowledged that CJKI had granted permission for the KKLC to reprint a portion of CJKI's

copyrighted data from Mr. Halpern's *Kodansha Kanji Learner's Dictionary* ("**KKLD**"), including Kanji Character Data (a)-(c).

38. The Defendants knew or should have known that the Kanji Character Data (d)-(f) was, and continues to be, public data that has never been owned by CJKI, and that CJKI has no basis for claiming a violation of a proprietary "rendering" of this data. For example, the Defendants' "rendering" of radicals and radical numbers in the KKLD closely resembles the rendering of such data in other dictionaries published long before either the KKLD or its parent dictionary.

39. Mr. Halpern was aware that CJKI had granted Mr. Conning permission to use CJKI-prepared data in the KKLC readings index, since Mr. Halpern had himself directed CJKI staff to assist in preparing the readings index to be used in the KKLC.

40. Mr. Halpern and CJKI either knew the allegations that they made to KUI regarding the list of similar characters (Kanji Character Data item (h) from Paragraph 35 above) were false when made, or at the very least, acted negligently in failing to ascertain whether the allegation that Mr. Conning used CJKI's similar character data was true before publishing it to KUI to the detriment of Mr. Conning.

41. The Defendants' contemporaneous actions, their contemporaneous correspondence, and their pleadings before the JCAA Arbitrator make clear that the Defendants knew that the Plaintiff was entitled to use Kanji Character Data items (a) through (g) in making the KKLC.

42. Mr. Halpern willingly contributed a glowing foreword for the KKLC. He did so after having thoroughly familiarized himself with the book's contents, including its use of the

Kanji Character Data. Mr. Halpern was therefore aware that his subsequent assertion that these data were used without the Defendants' authorization was false and defamatory.

43.    Defendants made the false and defamatory statements about Mr. Conning discussed above to harm Mr. Conning, to damage his relationship with KUI, and to dissuade him from pursuing the Final Award payment owed to him by CKJI.

44.    The Defendants' false accusations discussed herein were capable of damaging Mr. Conning's reputation, have in fact damaged his reputation, and continue to damage his reputation.  In particular, Defendants' false accusations have damaged Mr. Conning's reputation in the East Asian language-learning publishing community, including among publishers and editors. By falsely telling KUI, a major publisher in Mr. Conning's industry, that Mr. Conning used another party's data without permission and that he misled his publisher, CJKI prejudiced Mr. Conning in his profession and interfered with his ability to make a living. These false accusations have already caused KUI to stop distributing the KKLC, and have interfered with Mr. Conning's ability to publish further works in the future, especially within the tight-knit East Asian language education community, the field in which Mr. Conning would otherwise have enjoyed his best commercial publishing opportunities.

45.    Within the language education and academic communities of which Mr. Conning is a member, using someone else's work without permission is considered a serious offense and one who is accused of such an offense is the object of scorn and contempt, and is often excluded from the community and from opportunities within the community.

46.   According to Mr. Halpern's own email, his accusation reached not only the Plaintiff's publisher in the United States (KUI), but also persons involved in the publishing industry in Tokyo, including persons involved with the former Kodansha International ("**KI**").

47.   To the extent that future opportunities depend on a track record of success or trustworthiness, Defendants' interference with the publication and sale of the KKLC through their false accusations harms Mr. Conning's future publishing and business opportunities in other areas, such as his opportunities for publishing his planned books for learners of Chinese.

48.   The Defendants' actions have harmed Mr. Conning both professionally and financially.

### Interference with Contractual and Advantageous Business Relationships

49.   Mr. Conning has a contractual relationship with KUI whereby KUI is to print and distribute Mr. Conning's KKLC and under which Mr. Conning is to receive a royalty for each copy of the KKLC printed. Because more than 15,500 copies of the KKLC have been printed, Mr. Conning is entitled under the terms of his contract to receive a royalty of 8 percent of the book's retail price of $34 for each copy of the book that KUI prints, which works out to $2.72 per copy.

50.   The Defendants knew since at least 2013 about the Plaintiff's relationship with KUI.

51.   Because Mr. Halpern also publishes with KUI, he is well aware of the ways in which an author depends on such publishing relationships for business opportunities, including the opportunity to receive royalties, to publish revised editions, and to publish additional books.

52.   In a May 18, 2018 email, Mr. Halpern threatened to harm Mr. Conning's relationship with KUI by convincing KUI that Mr. Conning's book contained "unauthorized data."

53.  At the time Mr. Halpern carried out this threat, he was aware that his allegations of unauthorized data use were false.

54.  Mr. Halpern carried out his threat to harm Mr. Conning's relationship with KUI by publishing his false accusation that Mr. Conning's book contained "unauthorized data" in multiple communications with KUI in mid-2015 and again in the period from approximately December, 2017 to mid-July, 2018.

55.  As a result of Mr. Halpern's publication of these false accusations, KUI pressured Mr. Conning in a series of communications first in mid-2015 and then again from January, 2018 to the present to reach a settlement with CJKI (which would have involved accepting a smaller payment than he was due under the Final Award, or no payment at all), including suspending distribution of his book.

56.  Mr. Halpern was aware that his false allegations were likely to harm Mr. Conning's advantageous business relationship with KUI.  In fact, Mr. Halpern specifically intended that his false accusations would harm Mr. Conning's relationship with KUI, as evidenced by his communications with Mr. Conning. For example, Mr. Halpern wrote in an email to Mr. Conning: "former KI advised that KUI remove KLC from the market at your expense[.] This option is obviously to your disadvantage, and will also bring KUI extreme unpleasantness, harming your relationship."

57.  The Defendants were aware that their false allegations were likely to interfere with Mr. Conning's ability to earn royalties from his book. In fact, Mr. Halpern had previously threatened in a series of emails in June of 2015 to take actions that would result in KUI's suspending sales of Mr. Conning's book.

58.   In a May 18, 2015 email from Mr. Halpern to Mr. Conning, Mr. Halpern threatened that, if Mr. Conning did not agree to an unfavorable amendment to the Consulting Agreement, Mr. Halpern would consider several options, including "request[ing] that KUI remove KLC from the market. Both KUI and former KI officials are aware of the unauthorized data. KUI will no doubt cooperate because of their unwillingness to use unauthorized data and because they greatly value our relationship."

59.   On June 3, 2015, Mr. Halpern wrote an email to Mr. Conning threatening that if Mr. Conning did not accede to Mr. Halpern's demands, Mr. Halpern would cause KUI to terminate publication of Mr. Conning's book, the KKLC: "Do yourself a favor and don't cause [KUI] any unpleasantness. Just like your shenanigans backfired with me, they will backfire with them with the result that they will no doubt pull KLC from the market."

60.   Two days later, on June 5, 2015, Mr. Halpern again emailed Mr. Conning threatening that his book would be withdrawn from the market if he did not yield to the Defendants' demands: "Just sign the agreement by June 15 and let's move forward. If you don't I suspect that KUI will withdraw KLC from the market and probably stop the press."

61.   The Defendants interfered with Mr. Conning's relationship with KUI by falsely telling KUI in mid-2015 and again in the period from approximately December, 2017 to mid-July, 2018 that Mr. Conning had used CJKI data without authorization.

62.   The Defendants' interference with Mr. Conning's relationship with KUI was willful, knowing, and intentional.

63.   The Defendants' actions have damaged Mr. Conning's relationship with KUI making it unlikely that KUI will work with Mr. Conning on other projects, which otherwise would have been likely to happen based on the resounding success of the KKLC.

64. Upon information and belief, Mr. Conning has lost business opportunities as a result of the Defendants' interference with his relationship with KUI, including the expansion of the KKLC into a multi-volume series. Specifically, in a November 2016 meeting with KUI Marketing Director Laura Shatzkin, Mr. Conning outlined a major business proposal to KUI for revising and expanding the KKLC into such a series. However, Ms. Shatzkin expressed pessimism regarding the possibility of the project going forward because of KUI's concerns over Mr. Halpern's earlier claims that the KKLC contained data CJKI had not authorized. Mr. Conning followed up by sending KUI a new detailed written proposal the following month, which KUI did not accept. The expansion of the KKLC would have been worth at least an additional $20,000 per year to Mr. Conning had it gone forward, but it did not go forward as a direct result of Defendants' interference with the relationship between Mr. Conning and KUI.

65. On January 18, 2018, Mr. Conning received a letter from KUI Chief Operating Officer Takashi Sakuda indicating that Mr. Halpern had claimed improper use of *"an enormous amount of...kanji data"* in the KKLC. Mr. Sakuda told Mr. Conning that under KUI's publishing contract with Mr. Conning, Mr. Conning was responsible for securing all permissions for the KKLC, and asked him to *"respond as soon as possible so that...KUI will not have to take any further action."*

66. Mr. Conning replied the same day asking KUI to forward him the lists of data Mr. Halpern had claimed were used without permission, so that he could address KUI's concerns in full detail without leaving any of the data unaddressed. KUI declined to forward this information to Mr. Conning, instead asking Mr. Conning in a January 19, 2018 email to obtain the details of Mr. Halpern's claims directly from Mr. Halpern, and

then pressed Mr. Conning to "please submit to us written proof that you have permission to use that data, as stated in your contract with KUI."

67. Using information he had previously received from Mr. Halpern, Mr. Conning promptly refuted each claim appearing in KUI's January 18, 2018 email in a document he sent to KUI on January 25, 2018.

68. KUI continued to press Mr. Conning to settle his disputes with Mr. Halpern and CJKI even after he had refuted Mr. Halpern's claims. Referring to the unresolved situation created by CJKI and Mr. Halpern's false allegations that Mr. Conning used unauthorized data in the KKLC, KUI wrote in a February 23, 2018 email to Mr. Conning: "This situation must get resolved as soon as possible. If you and Jack can't come to a settlement, we'll have to take further action – and that's not going to be to anyone's advantage. Again, we're urging you to be in contact with Jack and work this out."

69. On March 8, 2018, KUI wrote to Mr. Conning, making clear that KUI would take action against Mr. Conning's interests if he did not settle the matter with Mr. Halpern and CJKI: "Again, we're urging you to do everything possible to get this settled between the two of you. If we're put in the position of having to take further action, it will be to no one's benefit."

70. Mr. Conning had, in fact, done everything possible to resolve his dispute with CJKI and Mr. Halpern since immediately after the Final Award, but Mr. Halpern had refused either to fulfill the terms of the Final Award or to accept an alternative compensation proposal offered by Mr. Conning. Instead, Mr. Halpern continued to threaten in a May 18, 2018 email that if Mr. Conning did not accept Mr. Halpern's terms, Mr. Halpern would have KUI "remove KLC from the market." Mr. Halpern and CJKI's approach was not to

negotiate in good faith, but rather to bully Mr. Conning in hopes that the threats to his relationship with KUI would cause him to abandon collection of the Final Award.

71.   The Defendants' actions caused KUI to remove KKLC from the market.

72.   On July 17, 2018, KUI wrote to Mr. Conning, informing him that it had suspended distribution of the KKLC until such time as Mr. Conning agreed to a settlement with Mr. Halpern and CJKI.

73.   Mr. Conning has suffered and continues to suffer economic losses of over $80 per day from the date of suspension on or about July 17, 2018, as a direct result of KUI's suspension of distribution of the KKLC.

## Other Unfair and Deceptive Conduct

74.   In a series of emails in March, April, and October of 2017, the Defendants threatened Mr. Conning that if he pursued his legal right to enforce the Final Award, CJKI would declare bankruptcy and he would get nothing.

75.   Rather than being insolvent, Defendant CJKI has simply prioritized other expenditures over paying Mr. Conning the amount owed to him pursuant to the Final Award. CJKI used the extra liquidity from its unpaid debt to Mr. Conning to pay for high-level professional services and to expand into a new area of business activity. Specifically, since issuance of the Final Award on February 13, 2017, CJKI has not only maintained its corporate staff, but has also engaged accountants, lawyers, "professional management consulting companies," and a "top management expert," and has launched a new area of business activity in the field of artificial intelligence.

76.   By using funds owed to Mr. Conning to expand its own business, CJKI left Mr. Conning in a state of financial distress, thereby preventing him from pursuing similar opportunities.

In so doing CJKI has shown an unfair and unscrupulous disregard for the consequences it has caused Mr. Conning.

77.     The Defendants attempted to pressure Mr. Conning into accepting partial payment by claiming they lacked the resources to pay the Final Award. Mr. Conning spent many hours of work time and incurred considerable additional legal expenses both in attempting to collect the Final Award and in attempting to arrange an alternative settlement in response to the Defendants' claim that they could not pay. However, it later came to light that the Defendants in fact had access to liquid assets that could have been used to pay the Final Award. The Defendants misled Mr. Conning regarding their capacity to pay, causing him additional legal expenses and loss of time. It also came to light that Mr. Halpern had engaged in extended international travel during this period, while the Plaintiff remained unpaid and therefore unable to afford such travel himself.

78.     The Defendants have employed threats and deceit to force Mr. Conning to spend over 120 hours in lost work time to pursue the amount owed to him under the Final Award. These lost work hours have kept him and his family in a prolonged state of financial distress. The Defendants have repeatedly sought to contrive artificial delays, attempting in bad faith to convey the impression that they were attempting to fulfill their obligations and were somehow being blocked by Mr. Conning from doing so. To compound these injuries, the Defendants have repeatedly accused Mr. Conning of preventing them from complying with the Final Award. Moreover, the Defendants have laced these deceitful accusations with insults and efforts to intimidate the Plaintiff, including by threatening to interfere with this relationship with KUI and then carrying out that threat.

79.    Mr. Conning would have been compensated at a rate of at least $80 per hour for work performed during the hours that were lost as a result of Defendants' actions.

80.    The Defendants have repeatedly made false promises that payment of the debt was imminently forthcoming. Mr. Conning has been deceived by these promises into believing that he might soon be able to repay his own creditors. The Defendants made these promises repeatedly, including in February, March, April, July, August, October, November, and December of 2017, as well as February, March, April, and May of 2018.

81.    The Plaintiff has suffered serious harms as a result of the unfair and deceptive conduct detailed herein. Among these are (a) spending over 120 hours pursuing payment or settlement by CJKI over the course of the past 18 months; (b) incurring an estimated $7,000 in legal expenses as a result of his reliance on Defendant's false promises and false statements; (c) being diverted from pursuing employment due to coping with Defendant's defamatory accusations, failure to pay the judgment, and interference with his business relations with KUI; (d) suffering emotional distress as a result of the malicious false and defamatory accusations and insults leveled against him by Defendants; (e) missing out on potential lucrative business opportunities due to the lack of time and resources caused by Defendants' actions; (f) suffering emotional distress at seeing his elderly parents live in impoverished circumstances—and his mother pass away—while he remained unable to begin repaying the loan his parents extended to help his family survive the ongoing financial disaster caused to him by the Defendants.

## COUNT I – DEFAMATION

82.    Mr. Conning re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 81, above.

83. The Defendants' statements alleged herein were false statements of fact concerning the Plaintiff.

84. The Defendants knew or had reason to know that the statements alleged were false when made.

85. The Defendants acted with a reckless disregard with respect to alleged statements' truth or falsity.

86. The Defendants negligently disseminated and published the alleged statements to third parties.

87. The Defendants' statements were disseminated and published to third parties, including KUI, former officers of KI, and others.

88. Upon information and belief, the Defendants' alleged statements were made orally and in writing.

89. The Defendants' alleged statements constitute libel and slander *per se*.

90. The Defendants' alleged statements are capable of damaging the plaintiff's reputation in the community, specifically, the professional community of East Asian language education.

91. Mr. Conning has endured mental suffering as a result of the Defendants' defamatory statements.

92. The Defendants' statements harmed and continue to harm Mr. Conning's reputation and caused Mr. Conning pecuniary harm in an amount to be determined at trial.

<u>**COUNT II – TORTIOUS INTERFERENCE WITH CONTRACTUAL/ADVANTAGEOUS BUSINESS RELATIONSHIPS**</u>

93. Mr. Conning re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 92, above.

94.  Mr. Conning had an advantageous business relationship with KUI whereby KUI would distribute and sell his book, the KKLC, on the open market.

95.  Mr. Conning has and continues to be denied the benefit of the bargain of this contract with KUI due to the Defendants' interference, as described herein.

96.  But for the Defendants' alleged interference herein, Mr. Conning had prospective business opportunities with KUI with respect to new books and publications.

97.  The Defendants knew of Mr. Conning's KKLC distribution relationship and prospective business opportunities with KUI.

98.  The Defendants knowingly interfered with Mr. Conning's relationship with KUI through improper motive and means. Mr. Halpern believed the interference detailed herein had the potential to generate pressure that could benefit CJKI and protect it from the consequences of its previous wrongdoing. For example, he believed that the threat of having the KKLC removed from the market would force Mr. Conning to sign an unfavorable amendment to the Consulting Agreement in 2015 and to abandon his rights to payment to the amount owed him by CJKI pursuant to the Final Award in 2017 and 2018.

99.  The Defendants knowingly damaged Mr. Conning's relationship with KUI, causing KUI to discontinue distributing and selling Mr. Conning's book, the KKLC, and, upon information and belief, causing KUI not to accept Mr. Conning's business proposals.

100.  Mr. Conning has suffered and continues to suffer damages as a result of the Defendants' conduct.

### COUNT III – G.L. c. 93A (unfair or deceptive trade practices)

101.   Mr. Conning re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 99, above.

102.   The parties are engaged in the conduct of trade or commerce within the meaning of G.L. c. 93A to the extent such conduct is required for the Plaintiff's G.L. c. 93A claim.

103.   A demand letter was not required for purposes of G.L. c. 93A, § 9 to institute this claim because the Defendants do not maintain a place of business or do not keep physical assets within the Commonwealth.

104.   The unfair and deceptive trade practices described herein, and the effects of those practices, occurred primarily and substantially within the Commonwealth of Massachusetts for purposes of G.L. c. 93A, § 11 to the extent § 11 applies.

105.   The acts and practices described herein constitute unfair and/or deceptive acts within the meaning of G.L. c. 93A.

106.   Mr. Conning has been damaged and continues to suffer damages as a result of the Defendants' unfair and/or deceptive acts and practices.

## COUNT IV – RECOGNIGITION, CONFIRMATION, AND ENFORCEMENT OF ARBITRATION AWARD PURSUANT TO 9 U.S.C. §§ 201 & 207 and M.G.L. c. 251, §§ 11 & 14

107.   Mr. Conning re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 105, above.

108.   Mr. Conning obtained the Final Award, attached hereto as **Exhibit A,**[1] against the Defendants as a result of arbitration proceedings held by the JCAA Arbitrator.

109.   The Final Award is in writing and was signed by the JCAA Arbitrator.

---

[1] Mr. Conning will provide a certified copy of the Final Award upon request by the Court.

110.   The arbitration provision upon which the JCAA arbitration proceedings arose is a valid and enforceable provision. A true and accurate copy of the contract that contains the arbitration provision is attached hereto as **Exhibit B**.

111.   The Final Award arose out of a commercial legal relationship.

112.   Japan is a contracting state of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

113.   Pursuant to 9 U.S.C. §§ 201 & 207, M.G.L. c. 251, §§ 11& 14, and common law, this Court has jurisdiction to recognize, confirm, and enforce the Final Award, by way of judgment, against the Defendants.

114.   To date, CJKI has failed to pay $30,861.91 of the amount it owes Mr. Conning pursuant to the Final Award.

115.   This confirmation request is made within 3 years of the Final Award.

## REQUESTS FOR RELIEF

WHEREFORE, Mr. Conning respectfully requests that this Court:

1.   Recognize, confirm, and enforce Mr. Conning's arbitration award, attached hereto as **Exhibit A,** by providing a judgment on the award and ordering defendant CJK Dictionary Institute, Inc. to pay the remaining $30,861.91 of the Final Award to Mr. Conning plus applicable pre-judgment interest, calculated pursuant to M.G.L. c. 231, §§ 6B and 6H.

2.   Preliminarily and permanently enjoin the Defendants from publishing further defamatory statements concerning Mr. Conning and from interfering with Mr. Conning's present and prospective business relationships, including without limitation, Mr. Conning's relationship with Kodansha USA, Inc.;

3.  Order the Defendants to retract all defamatory statements directly or indirectly concerning Mr. Conning by notifying Kodansha USA, Inc. and any other third parties that received such statements that Mr. Conning did not use unauthorized data in his books or other publications.

4.  Order the Defendants to provide Kodansha USA, Inc. any necessary permissions it needs to continue publishing Mr. Conning's book The Kodansha Kanji Learner's Course: A Step-by-Step Guide to Mastering 2300 Characters.

5.  Enter judgment for Mr. Conning on all Counts of this Complaint;

6.  Award Mr. Conning damages as determined at trial, plus interest and costs as provided by law;

7.  Award Mr. Conning double and/or treble damages as permitted by law, plus his reasonable attorneys' fees and costs; and

8.  Grant Mr. Conning any such other relief as this Court deems just and proper.

### JURY DEMAND

Mr. Conning demands a jury trial on all issues so triable.

DATED: September 28, 2018

Respectfully submitted,
Plaintiff
Andrew Scott Conning,
By his attorneys,

_____
Kenneth R. L. Parker (BBO #688987)
Shaun P. Keough (BBO #688868)
_____ (BBO #692764)
LP

., Suite 205
61

MIDDLESEX, SS.   ***Commonwealth of Massachusetts***
SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT

In testimony that the foregoing is a true copy on file and of record made by photographic process, I hereunto set my hand and affix the seal of said Superior Court this Eighth day of November, 2018.

_____
Deputy Assistant Clerk

Newton, MA 02459
Tel.: (617) 841-2418
Fax.: (617) 963-8315
E-mail: kparker@parkerkeough.com

COMMONWEALTH OF MASSACHUSETTS
MIDDLESEX COUNTY
Docket Report

## 1881CV02831 Conning, Andrew Scott vs. Halpern, Jack et al

| | | | |
|---|---|---|---|
| **CASE TYPE:** | Administrative Civil Actions | **FILE DATE:** | 10/02/2018 |
| **ACTION CODE:** | E05 | **CASE TRACK:** | X - Accelerated |
| **DESCRIPTION:** | Confirmation of Arbitration Awards | | |
| **CASE DISPOSITION DATE** | | **CASE STATUS:** | Open |
| **CASE DISPOSITION:** | Pending | **STATUS DATE:** | 10/02/2018 |
| **CASE JUDGE:** | | **CASE SESSION:** | Civil H Rm 520 |

### PARTIES

**Plaintiff**
Conning,  Andrew Scott

**Attorney**                                    688987
Kenneth Robert Leopold Parker
Parker Keough LLP
Parker Keough LLP
51 Winchester St
Suite 205
Newton Highlands, MA 02461
Work Phone (617) 841-2418
Added Date: 10/02/2018

**Defendant**
CJK Dictionary Institute, Inc.

**Defendant**
Halpern,  Jack

### FINANCIAL DETAILS

| Date | Fees/Fines/Costs/Charge | Assessed | Paid | Dismissed | Balance |
|---|---|---|---|---|---|
| 10/02/2018 | Civil Filing Fee (per Plaintiff) | 240.00 | 240.00 | 0.00 | 0.00 |
| 10/02/2018 | Civil Security Fee (G.L. c. 262, § 4A) | 20.00 | 20.00 | 0.00 | 0.00 |
| 10/02/2018 | Civil Surcharge (G.L. c. 262, § 4C) | 15.00 | 15.00 | 0.00 | 0.00 |
| 10/22/2018 | Fee for Blank Summons or Writ (except Writ of Habeas Corpus) MGL 262 sec 4b | 20.00 | 20.00 | 0.00 | 0.00 |
| | **Total** | **295.00** | **295.00** | **0.00** | **0.00** |

**MIDDLESEX COUNTY**
**Docket Report**

## INFORMATIONAL DOCKET ENTRIES

| Date | Ref | Description | Judge |
|------|-----|-------------|-------|
| 10/02/2018 | | Attorney appearance<br>On this date Kenneth Robert Leopold Parker, Esq. added for Plaintiff<br>Andrew Scott Conning | |
| 10/02/2018 | | Case assigned to:<br>DCM Track X - Accelerated was added on 10/02/2018 | |
| 10/02/2018 | 1 | Original civil complaint filed. | |
| 10/02/2018 | 2 | Civil action cover sheet filed. | |
| 10/02/2018 | 3 | Plaintiff(s) Andrew Scott Conning's  Motion for<br>Approval Of Attachment On Trustee Process Of Funds Held By Google<br>LLC And Apple Inc. | |
| 10/02/2018 | 4 | Affidavit filed by Plaintiff Andrew Scott Conning in support of<br>Motion for Approval Of Attachment On Trustee Process Of Funds Held By<br>Google LLC And Apple Inc. | |
| 10/02/2018 | | Notice of 93A complaint sent to Attorney General | |
| 10/31/2018 | | Endorsement on Motion for Approval of Attachment on Trustee Process of<br>Funds Held by Google LLC and Apple, Inc. (#3.0): Other action taken<br>The within matter is set down for hearing on 11/8/18 in Courtroom 420 at<br>2:00 pm.  Notice mailed 10/31/18 and copy emailed<br><br>Judge: Henry, Hon. Bruce R | Henry |
| 11/08/2018 | | Event Result:: Hearing on Equity Issue scheduled on:<br>11/08/2018 02:00 PM<br>Has been: Canceled     For the following reason: Joint request of parties<br>Comments: CASE REMOVED TO U.S. DISTRICT COURT<br>Hon. Janice W Howe, Presiding<br>Appeared:<br>Staff:<br>Maria Pantos, Assistant Clerk Magistrate | Howe |
| 11/08/2018 | | REMOVED to the U.S. Bankruptcy Court<br><br>Applies To: Halpern, Jack (Defendant); CJK Dictionary Institute, Inc.<br>(Defendant) | |

MIDDLESEX, SS.  *Commonwealth of Massachusetts*
SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT

In testimony that the foregoing is a true copy on file
and of record made by photographic process, I hereunto
set my hand and affix the seal of said Superior Court
this Eighth day of November, 2018.

Deputy Assistant Clerk

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                                    MIDDLESEX SUPERIOR COURT

ANDREW SCOTT CONNING,

     Plaintiff,                                  C.A. No. 1881-cv-02831

v.

JACK HALPERN and CJK DICTIONARY
INSTITUTE, INC.,

     Defendants.

## **NOTICE OF REMOVAL**

Pursuant to 28 U.S.C. § 1446(d), Defendants Jack Halpern and CJK Dictionary Institute,

Inc. notify this Court that the above-captioned proceeding was removed to the United States

District Court for the District of Massachusetts on November 7, 2018.  A true and accurate copy

of the removal is attached hereto as Exhibit 1.  Federal law dictates that this Court "shall proceed

no further unless and until this case is remanded."  28 U.S.C. § 1446(d).

Dated:  November 7, 2018                    Respectfully submitted,

                                      JACK HALPERN and CJK DICTIONARY
                                      INSTITUTE, INC.,

                                      By its attorneys,

FILED
IN THE OFFICE OF THE
CLERK OF COURTS
FOR THE COUNTY OF MIDDLESEX

NOV 0 7 2018

CLERK

                                      Sean T. Carnathan, Esq. (BBO# 636889)
                                      scarnathan@ocmlaw.net
                                      Tara J. Myslinski (BBO #644936)
                                      tmyslinski@ocmlaw.net
                                      O'Connor, Carnathan and Mack LLC
                                      1 Van de Graaff Dr.
                                      Burlington, Massachusetts 01803
                                      (781) 359-9000
                                      (781) 359-9001 (facsimile)

## CERTIFICATE OF SERVICE

    I, Sean T. Carnathan, certify that a true and accurate copy of this filing was served on all parties of record by electronic and first-class mail on November 7, 2018.

Sean T. Carnathan

4830-9838-8858, v. 1

# EXHIBIT 1

## Notices

1:18-cv-12336 Conning v. Halpern et al

### United States District Court

### District of Massachusetts

## Notice of Electronic Filing

The following transaction was entered by Carnathan, Sean on 11/7/2018 at 12:40 PM EST and filed on 11/7/2018

| | |
|---|---|
| **Case Name:** | Conning v. Halpern et al |
| **Case Number:** | 1:18-cv-12336 |
| **Filer:** | CJK Dictionary Institute, Inc. |
| | Jack Halpern |

**Document Number:** 1

**Docket Text:**
**NOTICE OF REMOVAL by CJK Dictionary Institute, Inc., Jack Halpern ( Filing fee: $ 400, receipt number 0101-7401701 Fee Status: Filing Fee paid) (Attachments: # (1) Exhibit A, # (2) Exhibit B, # (3) Category Form, # (4) Civil Cover Sheet)(Carnathan, Sean)**

**1:18-cv-12336 Notice has been electronically mailed to:**

Sean T. Carnathan    scarnathan@ocmlaw.net, hwolti@ocmlaw.net, lfitzpatrick@ocmlaw.net

**1:18-cv-12336 Notice will not be electronically mailed to:**

Andrew Conning
3263 Vineyard Avenue
Space 100
Pleasanton, CA 94566

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=11/7/2018] [FileNumber=7959309-0
] [763c81b78938537fd86a2088651bc99affb5d27a266abd388ba6014fa72a7496779
fe021663cd5dfdffa34534fa3f41e4355c2d9880286c6a991654b9a34e566]]
**Document description:**Exhibit A
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=11/7/2018] [FileNumber=7959309-1
] [4601de11b05c91b8b7e14fd9b4a875582d0c110155150ffa3532f7c340dd2b9228f
3dfe2816016a8dded3e6c3ce2a53cee7b863961ff1a3fe163b1d940a454eb]]
**Document description:**Exhibit B

**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=11/7/2018] [FileNumber=7959309-2
] [4e7ee1fbf3d46588265b1f13d892dd9f4e31cca88d6ff61fec5f9e561ab2e604f4b
4f69ef19f840b27267f6859a37cde88de1ff71ea428917fe18f329ab8007c]]
**Document description:** Category Form
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=11/7/2018] [FileNumber=7959309-3
] [92f59318c098d82b9a2239b32c5260090581384dcc52302776fc147033025034b5d
a2dfe2a1705e335a2afbab33d653aeb6331afde860addf00648df121983b1]]
**Document description:**Civil Cover Sheet
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=11/7/2018] [FileNumber=7959309-4
] [a5e71bb9ce83b90f08eeaf6d997ad0975f1143781195439672e1632b553a93f7281
6c82f6de6fc74bd27da293ec9929f3b8085d861b 182bf9512b7b838d7c575]]

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ANDREW SCOTT CONNING,

     Plaintiff,

v.

JACK HALPERN and CJK DICTIONARY
INSTITUTE, INC.,

     Defendants.

C.A. No. _____

## **NOTICE OF REMOVAL**

Defendants Jack Halpern and CJK Dictionary Institute, Inc. file this Notice of Removal
pursuant to 28 U.S.C. § 1446(a), and show the following:

1.     On or about October 2, 2018, Plaintiff Andrew Scott Conning filed a complaint
styled *Andrew Scott Conning v. Jack Halpern and CJK Dictionary Institute, Inc.*, Cause No. 18-
2831, in the Middlesex Superior Court in the Commonwealth of Massachusetts (the "State Court
Lawsuit").

2.     Defendants did not receive notice of the State Court Lawsuit until Friday,
November 3, 2018, when they received a copy of the pleadings from Plaintiff's counsel via
FedEx delivery to Defendants' Japan business address.  See true copies of enclosure letters,
attached hereto as Exhibit A.  Plaintiff failed to properly serve Defendants, citizens or subjects of
a foreign state.

3.     The State Court Action asserts four counts in connection with a dispute between
Plaintiff and Defendants concerning Plaintiff's use of Defendants' copyright work.  The counts
consist of defamation, tortious interference with contractual/advantageous business relationship,

unfair or deceptive trade practices, and a count seeking recognition, confirmation, and enforcement of an arbitration award in a dispute before the Japan Commercial Arbitration Association.

4.     None of the alleged facts underlying Plaintiff's claims occurred in the Commonwealth of Massachusetts, and neither Defendant is amendable to suit in the Commonwealth of Massachusetts.

5.     This Court has original subject matter jurisdiction over the State Court Lawsuit pursuant to 28 U.S.C. § 1332(a)(2) because (a) it is a civil action between a U.S. citizen and citizens or subjects of a foreign state, and (b) the amount in controversy exceeds $75,000. Specifically, Plaintiff is a U.S. citizen and both Mr. Halpern and CJK Dictionary Institute, Inc. are citizens or subjects of Japan. Neither Defendant is a permanent resident alien or domiciled in the U.S. Further, in the State Court Action, Plaintiff alleges damages in the amount of $246,221.91.

6.     This Notice of Removal is timely under 28 U.S.C. § 1446(b) because it is filed within 30 days of Defendants' receipt of the State Court Lawsuit.

7.     Written notice of this Notice of Removal will be served immediately on all parties and a copy will be filed with the Clerk of the Middlesex Superior Court in the Commonwealth of Massachusetts.

8.     Further, attached as Exhibit B is a copy of the filings contained in the file with the Clerk of the Middlesex Superior Court in the Commonwealth of Massachusetts.

Respectfully submitted,

JACK HALPERN and CJK DICTIONARY
INSTITUTE, INC.,

By its attorneys,

/s/ Sean T. Carnathan
Sean T. Carnathan, Esq. (BBO# 636889)
scarnathan@ocmlaw.net
Tara J. Myslinski (BBO #644936)
tmyslinski@ocmlaw.net
O'Connor, Carnathan and Mack LLC
1 Van de Graaff Dr.
Burlington, Massachusetts 01803
(781) 359-9000
(781) 359-9001 (facsimile)

Dated:  November 7, 2018

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ Tara J. Myslinski

4825-9408-9338, v. 1

# EXHIBIT A



# ⊥PARKER KEOUGH LLP
## ATTORNEYS AT LAW

**Mailing Address: P.O. Box 590006 • Newton, MA 02459**
**Office Address: 51 Winchester St., Suite 205 • Newton, MA 02461**
**info@parkerkeough.com • www.parkerkeough.com • (617) 841-2418**

October 31, 2018

**By FedEx**

CJK Dictionary Institute, Inc.
Komine Building
34-14, 2-chome, Tohoku, Niiza-shi
Saitama 352-0001, Japan

**Re:  Complaint, Summons, and Motion for Trustee Attachment**
**Andrew Scott Conning v. Jack Halpern, 1881-CV-02831**

Dear CJK Dictionary Institute, Inc.:

Enclosed please find the following:

1) Complaint and Jury Demand; Request to Recognize, Confirm, and Enforce Foreign Arbitration Award Pursuant to 9 U.S.C. §§ 201 & 207 And M.G.L. c. 251 §§ 11 & 14;
2) Summons;
3) Civil Action Cover Sheet;
4) Motion for Approval of Attachment on Trustee Process of Funds Held by Google LLC and Apple Inc.;
5) Plaintiff's Affidavit in Support of Motion for Approval of Attachment on Trustee Process of Funds Held by Google LLC and Apple Inc.; and
6) Notice of Hearing on Motion for Approval of Attachment on Trustee Process of Funds Held by Google LLC and Apple Inc.

As stated on the notice of hearing, the hearing on the Motion for Approval of Attachment on Trustee Process of Funds Held by Google LLC and Apple Inc. is scheduled for **November 8, 2018 at 2:00 pm in Courtroom 420, 200 Trade Center, Woburn, MA 01801.**

Thank you for your attention to this matter.

Sincerely,

Nathaniel Lichtin

Enclosures



# ⊥PARKER KEOUGH LLP
## ATTORNEYS AT LAW

**Mailing Address:** P.O. Box 590006 • Newton, MA 02459
**Office Address:** 51 Winchester St., Suite 205 • Newton, MA 02461
info@parkerkeough.com • www.parkerkeough.com • (617) 841-2418

October 31, 2018

**By FedEx**

Jack Halpern
CJK Dictionary Institute, Inc.
Komine Building
34-14, 2-chome, Tohoku, Niiza-shi
Saitama 352-0001 Japan

Re:     **Complaint, Summons, and Motion for Trustee Attachment**
        **Andrew Scott Conning v. Jack Halpern, 1881-CV-02831**

Dear Mr. Halpern:

Enclosed please find the following:
1) Complaint and Jury Demand; Request to Recognize, Confirm, and Enforce Foreign Arbitration Award Pursuant to 9 U.S.C. §§ 201 & 207 And M.G.L. c. 251 §§ 11 & 14;
2) Summons;
3) Civil Action Cover Sheet;
4) Motion for Approval of Attachment on Trustee Process of Funds Held by Google LLC and Apple Inc.;
5) Plaintiff's Affidavit in Support of Motion for Approval of Attachment on Trustee Process of Funds Held by Google LLC and Apple Inc.; and
6) Notice of Hearing on Motion for Approval of Attachment on Trustee Process of Funds Held by Google LLC and Apple Inc.

As stated on the notice of hearing, the hearing on the Motion for Approval of Attachment on Trustee Process of Funds Held by Google LLC and Apple Inc. is scheduled for **November 8, 2018 at 2:00 pm in Courtroom 420, 200 Trade Center, Woburn, MA 01801.**

Thank you for your attention to this matter.

Sincerely,

Nathaniel Lichtin

Enclosures

# EXHIBIT B

## Commonwealth of Massachusetts

MIDDLESEX, SS.

TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT
CIVIL DOCKET NO. *1881-CV-02831*

_Andrew Scott Conning_ , PLAINTIFF(S),

V.
_Jack Halpern and CJK_ , DEFENDANT(S)
_Dictionary Institute, Inc._



**SUMMONS**

THIS SUMMONS IS DIRECTED TO _Jack Halpern_ . (Defendant's name)

<u>You are being sued</u>. The Plaintiff(s) named above has started a lawsuit against you. A copy of the
Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been
filed in the _Middlesex Superior_ Court. **YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. <u>You must respond to this lawsuit in writing within 20 days</u>. If you do not respond, the court may decide
the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the
opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect
to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an
extension of time in writing from the Court.**

2. **How to Respond.** To respond to this lawsuit, you must file a written response with the court **and** mail a
copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:
   a. Filing your **signed original** response with the Clerk's Office for Civil Business, _Middlesex Superior_ Court,
   _200 Trade Center, Woburn MA 01801_ (address), by mail or in person, **AND**
   b. Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following
   address: _Ken Parker, Parker Keough LLP 51 Winchester St., Suite 205, Newton MA 02461_

3. **What to include in your response.** An **"Answer"** is one type of response to a Complaint. Your Answer
must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint.
Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to
use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are
based on the same facts or transaction described in the Complaint, then you must include those claims
in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this
lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your
Answer or in a written demand for a jury trial that you must send to the other side and file with the
court no more than 10 days after sending your Answer. You can also respond to a Complaint by filing a
**"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion
to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12.** If
you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions"
described in the rules of the Court in which the complaint was filed, available at
www.mass.gov.courts/case-legal-res/rules of court.

4. **Legal Assistance.** You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

5. **Required information on all filings:** The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Judith Fabricant, Chief Justice on _October 31_____, 20 _18_.

Michael A. Sullivan
Clerk-Magistrate

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

## PROOF OF SERVICE OF PROCESS

I hereby certify that on _____, 20___, I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4(d)(1-5)):

_____

_____

_____

Dated:_____, 20____        Signature:_____

**N.B.    TO PROCESS SERVER:**

PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

_____

                                          , 20____

## Commonwealth of Massachusetts

MIDDLESEX, SS.

TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT
CIVIL DOCKET NO. _1891 - CV-02831_

_Andrew Scott Conning_ , PLAINTIFF(S),

V.
_Jack Halpern, and CJK_
_Dictionary Institute Inc._ , DEFENDANT(S)

### SUMMONS

THIS SUMMONS IS DIRECTED TO _( JK Dictionary Institute, Inc._ . (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the
Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been
filed in the _Middlesex Superior_ Court. **YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.** If you do not respond, the court may decide
   the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the
   opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect
   to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an
   extension of time in writing from the Court.**

2. **How to Respond.** To respond to this lawsuit, you must file a written response with the court **and** mail a
   copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

   a. Filing your **signed original** response with the Clerk's Office for Civil Business, _Middlesex Superior_ Court,
      _200 Trade Center, Woburn MA 01801_ (address), by mail or in person, **AND**

   b. Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following
      address: _Ken Parker, Parker Keough LLP, 51 Winchester St, Suite 205, Newton MA 02461_

3. **What to include in your response.** An **"Answer"** is one type of response to a Complaint. Your Answer
   must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint.
   Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to
   use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are
   based on the same facts or transaction described in the Complaint, then you must include those claims
   in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this
   lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your
   Answer or in a written demand for a jury trial that you must send to the other side and file with the
   court no more than 10 days after sending your Answer. You can also respond to a Complaint by filing a
   **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion
   to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12.** If
   you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions"
   described in the rules of the Court in which the complaint was filed, available at
   www.mass.gov.courts/case-legal-res/rules of court.

4.   **Legal Assistance.** You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

5.   **Required information on all filings:** The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Judith Fabricant, Chief Justice on _October 31_____ , 20 _18_.

Michael A. Sullivan
Clerk-Magistrate

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

## PROOF OF SERVICE OF PROCESS

I hereby certify that on_____, 20___ , I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4(d)(1-5)):

_____

_____

_____

Dated:_____ , 20___        Signature:_____

**N.B.    TO PROCESS SERVER:**

PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

_____
|                                       |
|                                       |
|                              , 20___  |
_____

| CIVIL ACTION COVER SHEET | DOCKET NUMBER | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| PLAINTIFF(S): | Andrew Scott Conning | COUNTY |
|---|---|---|
| ADDRESS: | 3263 Vineyard Avenue | Middlesex |
| Space 100 | | |
| Pleasanton, CA 94566 | | DEFENDANT(S):   Jack Halpern; and |
| ATTORNEY: | Kenneth R. L. Parker; Shaun P. Keough; Nathaniel J. Lichtin | CJK Dictionary Institute, Inc. |
| ADDRESS: | 51 Winchester Street | ADDRESS:   Komine Building |
| Suite 205 | | 34-14, 2-chome, Tohoku, Nāza-shi |
| Newton, MA 02461 | | Saitama 352-0001, Japan |
| BBO: | Kenneth Parker 688987 Shaun Keough 688868 Nathaniel Lichtin 692767 | |

**TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)**

| CODE NO.  B15 | TYPE OF ACTION (specify)  Defamation | TRACK  A | HAS A JURY CLAIM BEEN MADE?   ☒ YES   ☐ NO |
|---|---|---|---|

*If "Other" please describe:   BE1 (Business Torts) Track: A; D09 (Interference in contractual relationship) Track: F; BH1 (c. 93A) Track: A; E05 (Confirmation of Award) Track: X

**STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A**

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**
(attach additional sheets as necessary)

| | | |
|---|---|---|
| A. Documented medical expenses to date: | | |
| 1. Total hospital expenses ........................................................................................... | $ | |
| 2. Total doctor expenses ............................................................................................. | $ | |
| 3. Total chiropractic expenses .................................................................................... | $ | |
| 4. Total physical therapy expenses ............................................................................ | $ | |
| 5. Total other expenses (describe below) .................................................................. | $ | |
| Subtotal (A): | $ | |
| B. Documented lost wages and compensation to date ................................................ | $ | 9,600 |
| C. Documented property damages to dated ................................................................. | $ | |
| D. Reasonably anticipated future medical and hospital expenses ............................ | $ | |
| E. Reasonably anticipated lost wages ......................................................................... | $ | |
| F. Other documented items of damages (describe below) ........................................ | $ | 236,621.91 |
| lost profits to date (including estimated lost profits due to Defendants' conduct); unpaid portion of an arbitration award | | |
| G. Briefly describe plaintiff's injury, including the nature and extent of injury. | | |
| Mental anguish and tarnished reputation; estimated lost profits; estimated lost wages; and unpaid arbitration award. | | |
| The mental anguish and tarnished reputation damages to be determined at trial. | TOTAL (A-F):$ | 246,221.91 |

**CONTRACT CLAIMS**
(attach additional sheets as necessary)

Provide a detailed description of claims(s):

| | |
|---|---|
| | TOTAL: $ |

Signature of Attorney/Pro Se Plaintiff: X _____   Date: Sep 28, 2018

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

**CERTIFICATION PURSUANT TO SJC RULE 1:18**

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1.18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney of Record: X _____   Date: Sep 28, 2018

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

MIDDLESEX SUPERIOR COURT
C.A. NO. : _____

ANDREW SCOTT CONNING
      Plaintiff,

    v.

JACK HALPERN and CJK DICTIONARY INSTITUTE, INC.
      Defendants.

**HEARING REQUESTED
PURSUANT TO MASS. R.
CIV. P. 4.2**

## MOTION FOR APPROVAL OF ATTACHMENT ON TRUSTEE PROCESS OF FUNDS HELD BY GOOGLE LLC AND APPLE INC.

Pursuant to Rule 4.2 of the Massachusetts Rules of Civil Procedure, the Plaintiff Andrew Scott Conning hereby respectfully requests the Court's approval of attachment on trustee process of funds, deposits, or credits of the Defendants in the amount of $30,808.78 plus any applicable pre-judgment interest,[1] now in the control or possession of Apple Inc. of 1 Infinite Loop MS: 38-3TX, Cupertino, CA, 95014, a trustee, and Google LLC of 1600 Amphitheatre Pkwy, Mountain View, CA, 94043, a trustee. The trustees both have a usual place of business in the Commonwealth, and have sufficient contacts with the Commonwealth to justify this trustee process action against them.

_____

[1] Pursuant to M.G.L. c. 231, §§ 6B and 6H.

A hearing is requested pursuant to Rule 4.2(c). The Plaintiff respectfully requests a

hearing date as soon as possible for inclusion in a notice of hearing to be served on the

Defendants in accordance with Rule 4.2(c).

Once approved, the Plaintiff respectfully requests the issuance of two trustee summonses

to be served on the respective trustees in accordance with Rule 4.2(c).

An affidavit in support of this motion is attached hereto.


DATED: September 28, 2018                    Respectfully submitted,
                                             Plaintiff
                                             Andrew Scott Conning,
                                             By his attorneys,

                                             _____
                                             Kenneth R. L. Parker (BBO #688987)
                                             Shaun P. Keough (BBO #688868)
                                             Nathaniel J. Lichtin (BBO #692764)
                                             PARKER KEOUGH LLP
                                             *Street Address:*
                                               51 Winchester St., Suite 205
                                               Newton, MA 02461
                                             *Mailing Address:*
                                               P.O. Box 590006
                                               Newton, MA 02459
                                             Tel.: (617) 841-2418
                                             Fax.: (617) 963-8315
                                             E-mail: kparker@parkerkeough.com

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                                          MIDDLESEX SUPERIOR COURT
                                                       C.A. NO. : _____

| |
|---|
| ANDREW SCOTT CONNING<br>          Plaintiff,<br><br>      v.<br><br>JACK HALPERN and CJK DICTIONARY INSTITUTE,<br>INC.<br>          Defendants. |

## PLAINTIFF'S AFFIDAVIT IN SUPPORT OF MOTION FOR APPROVAL OF ATTACHMENT ON TRUSTEE PROCESS OF FUNDS HELD BY GOOGLE LLC AND APPLE INC.

I, Andrew Scott Conning, plaintiff in the above-referenced action, say of my own

knowledge, in support of this motion that:

1.  This is a civil action for, among other things, recognition, confirmation, and enforcement

    of an arbitral award I obtained against the Defendant CJK Dictionary Institute, Inc.

    ("CJKI") through arbitration proceedings before the Japan Commercial Arbitration

    Association. See Exhibit A attached to the Complaint and Jury Demand; Request to

    Recognize, Confirm, and Enforce Foreign Arbitration Award Pursuant to 9 U.S.C. §§ 201

    & 207 and M.G.L. c. 251, §§ 11 & 14 filed in this action (the "Final Award").

2.  To the extent this is an action "upon a judgment," no bond is required. However, if the

    Court finds that a bond is required, I am prepared to procure a bond in an amount the

Court orders, and shall file said bond with the Court before serving on the trustees any issued trustee summonses.

3.  Upon information and belief, there are presently monies or credits due said Defendants in the control and possession of the trustee, Apple Inc., and the trustee, Google LLC Specifically, Apple Inc. and Google LLC both hold assets of Defendant CJKI, which both regularly distribute to CJKI in the form of royalty payments based on sales of CJKI's software through the Apple App Store and Google Play Store.

4.  Both Apple Inc. and Google LLC are registered foreign business entities operating within the Commonwealth of Massachusetts, as indicated on the corporate database maintained by the Secretary of the Commonwealth of Massachusetts.

5.  Apple Inc.'s resident agent in the Commonwealth of Massachusetts is CT Corporation System with a principal place of business at 155 Federal Street Ste 700, Boston, Massachusetts, 02110, as indicated on the corporate database maintained by the Secretary of the Commonwealth of Massachusetts.

6.  Upon information and belief, Apple Inc. maintains a Massachusetts office at 111 Huntington Avenue, Floor 5, Boston, Massachusetts, 02199.

7.  Apple Inc. has several Apple Stores in the Commonwealth of Massachusetts, including four stores in Middlesex County: (1) 100 Cambridgeside Place, Cambridge, Massachusetts, 02141; (2) 199 Boylston Street, Chestnut Hill, Massachusetts, 02467; (3) 75 Middlesex Turnpike, Burlington, Massachusetts, 01803; and (4) 1245 Worcester Street, Natick, Massachusetts, 01760.

8.  Google LLC's resident agent in the Commonwealth of Massachusetts is Corporation Service Company with a principal place of business at 84 State Street, Boston,

Massachusetts, 02109, as indicated on the corporate database maintained by the Secretary of the Commonwealth of Massachusetts.

9. Google also has an office at 355 Main Street, Cambridge, Massachusetts 02142 called the "Google Cambridge Campus."

10. Upon information and belief, both trustees receive substantial revenue from transactions that take place within the Commonwealth of Massachusetts, in the nature of software and hardware sales.

11. I have a meritorious cause of action and there is a reasonable likelihood that a judgment will enter on the Final Award, in the amount of $30,861.91 plus any applicable pre-judgment interest.

12. I certify that I know of no liability insurance available to satisfy any judgment that may be obtained.

13. I know of no other assets of the Defendants available to satisfy any judgment.

14. The Defendants have refused to pay me the entire Final Award despite my reliance on their promises to pay over the course of the past 19 months.

15. To the extent statements in this affidavit are based upon information and belief, I believe the information upon which such statements are based to be true.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 28th DAY OF SEPTEMBER, 2018.

Andrew **Scott Conning**

3

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

MIDDLESEX SUPERIOR COURT
C.A. NO. : _____

18-2831

ANDREW SCOTT CONNING
     Plaintiff,

v.

JACK HALPERN and CJK DICTIONARY INSTITUTE, INC.
     Defendants.

**HEARING REQUESTED
PURSUANT TO MASS. R.
CIV. P. 4.2**

FILED
IN THE OFFICE OF THE
CLERK OF COURTS
FOR THE COUNTY OF MIDDLESEX

OCT 0 2 2018

CLERK

## MOTION FOR APPROVAL OF ATTACHMENT ON TRUSTEE PROCESS OF FUNDS HELD BY GOOGLE LLC AND APPLE INC.

Pursuant to Rule 4.2 of the Massachusetts Rules of Civil Procedure, the Plaintiff Andrew

Scott Conning hereby respectfully requests the Court's approval of attachment on trustee process

of funds, deposits, or credits of the Defendants in the amount of $30,808.78 plus any applicable

pre-judgment interest,[1] now in the control or possession of Apple Inc. of 1 Infinite Loop MS: 38-

3TX, Cupertino, CA, 95014, a trustee, and Google LLC of 1600 Amphitheatre Pkwy, Mountain

View, CA, 94043, a trustee. The trustees both have a usual place of business in the

Commonwealth, and have sufficient contacts with the Commonwealth to justify this trustee

process action against them.

Middlesex, ss.     Superior Court
The within matter is set down for hearing on
11 | 8 | 2018   20   , in courtroom
420   at 2:00 pm
          Assistant Clerk

_____

[1] Pursuant to M.G.L. c. 231, §§ 6B and 6H.

A hearing is requested pursuant to Rule 4.2(c). The Plaintiff respectfully requests a

hearing date as soon as possible for inclusion in a notice of hearing to be served on the

Defendants in accordance with Rule 4.2(c).

Once approved, the Plaintiff respectfully requests the issuance of two trustee summonses

to be served on the respective trustees in accordance with Rule 4.2(c).

An affidavit in support of this motion is attached hereto.

DATED: September 28, 2018

Respectfully submitted,
Plaintiff
Andrew Scott Conning,
By his attorneys,

Kenneth R. E. Parker (BBO #688987)
Shaun P. Keough (BBO #688868)
Nathaniel J. Lichtin (BBO #692764)
PARKER KEOUGH LLP
*Street Address:*
  51 Winchester St., Suite 205
  Newton, MA 02461
*Mailing Address:*
  P.O. Box 590006
  Newton, MA 02459
Tel.: (617) 841-2418
Fax.: (617) 963-8315
E-mail: kparker@parkerkeough.com

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

MIDDLESEX SUPERIOR COURT
C.A. NO. : _____

ANDREW SCOTT CONNING
     Plaintiff.

    v.

JACK HALPERN and CJK DICTIONARY INSTITUTE,
INC.
     Defendants.

## COMPLAINT AND JURY DEMAND: REQUEST TO RECOGNIZE, CONFIRM, AND ENFORCE FOREIGN ARBITRATION AWARD PURSUANT TO 9 U.S.C. §§ 201 & 207 AND M.G.L. c. 251, §§ 11 & 14

Andrew Scott Conning ("**Mr. Conning**" or "**Plaintiff**") brings this complaint against

Jack Halpern ("**Mr. Halpern**") and the CJK Dictionary Institute, Inc. ("**CJKI**") (collectively, the

"**Defendants**") for damages, injunctive relief, costs, and attorneys' fees based on the Defendants'

defamatory statements, tortious interference with contractual and advantageous business

relationships, and violations of M.G.L. c. 93A. In addition, Plaintiff respectfully requests that the

Court confirm and enforce Plaintiff's arbitration award against the Defendants pursuant to 9

U.S.C. §§ 201 & 207 (the Federal Arbitration Act) and M.G.L. c. 251, §§ 11 & 14 (the

Massachusetts Arbitration Act), a true and accurate copy of the arbitration decision and award

(the "**Final Award**") attached hereto as **Exhibit A**.

## PARTIES

1. Plaintiff Andrew Scott Conning is an individual who at all relevant times resided in Massachusetts, and who currently temporarily resides at 3263 Vineyard Avenue, Space 100, Pleasanton, CA, 94566.

2. Defendant Jack Halpern is a permanent resident of Japan and, upon information and belief, is the sole owner and Chief Executive Officer of Defendant CJKI.

3. Upon information and belief, CJKI does not have any other executive officers.

4. Defendant CJK Dictionary Institute, Inc. is a Japanese corporation which has its principal place of business at Komine Building, 2-chome, 34-14, Tohoku, Niiza-shi, Saitama 352-0001, Japan.

5. Upon information and belief, Mr. Halpern commingles his personal funds with CJKI's funds.

6. The actions and omissions of Mr. Halpern that he purports to take on behalf of CJKI are, for all intents and purposes, actions of Mr. Halpern in his individual capacity. For example, Mr. Halpern's threat to Mr. Conning that he could disrupt Mr. Conning's relationship with KUI was based on Mr. Halpern's personal relationship with KUI and expressly invoked that relationship.

## JURISDICTION AND VENUE

7. The Massachusetts Superior Court has jurisdiction over this action pursuant to G.L. c. 223A, § 3 and G.L. c. 214, § 1. The damages sought by Mr. Conning exceed $25,000, exclusive of interest and costs.

8. The Court has personal jurisdiction over the Defendants because (a) the claims at bar relate to the Defendants' business transactions in the Commonwealth and (b) the acts and omissions that give rise to the claims that have caused tortious injury to Mr. Conning in

the Commonwealth. The Defendants have regularly done business within the
Commonwealth through their transactions with the Plaintiff, including without limitation:

   a. Defendant CJKI entered into a contract with Plaintiff on April 10, 2014 at which
      time Plaintiff was a resident of the Commonwealth and Defendants knew that
      Plaintiff was a resident of the Commonwealth;

   b. Defendants engaged an attorney to seek a resolution to its dispute with the Plaintiff
      by holding meetings within the Commonwealth in September of 2015; and

   c. Defendants filed an arbitration counterclaim against the Plaintiff on February 1,
      2016, at which time Plaintiff was a resident of the Commonwealth and Defendants
      knew that Plaintiff was a resident of the Commonwealth.

9.  Defendant Mr. Halpern has regularly and extensively communicated with the Plaintiff
    since 2014 in the knowledge that the Plaintiff at all relevant times resided in the
    Commonwealth and communicated with Defendant from the Commonwealth.

10. Defendants derive substantial revenue from goods and services sold to and used by
    individuals in the Commonwealth. For example, they sell a variety of software
    applications to residents and businesses of the Commonwealth through software
    marketplaces, including without limitation the Apple App Store and the Google Play
    Store.

11. Defendants knew that Plaintiff intended to conduct and did in fact conduct his work
    pursuant to Defendant CJKI's contract with Plaintiff in the Commonwealth of
    Massachusetts.

12. Personal jurisdiction over the Defendants is reasonable and does not offend traditional
    notions of fair play or substantial justice because, as alleged with more specificity herein,

Defendants' actions were made within, or purposely directed into, the Commonwealth causing harm to a Massachusetts citizen within the Commonwealth. Specifically, with respect to defamation, the defamatory statements alleged herein were intentionally and expressly aimed by the Defendants at Mr. Conning with full knowledge that he was residing in and conducting his business from the Commonwealth, resulting in harm to Mr. Conning in the Commonwealth. Therefore, Defendants knew this harm was likely to be suffered by Mr. Conning in the Commonwealth.

13.    The Defendants had notice, and therefore it was foreseeable, that they could be haled into a Massachusetts court because, as alleged with more specificity herein, they voluntarily and knowingly entered into a business relationship and extensively communicated with Mr. Conning with the knowledge that he resided in Massachusetts, would conduct his part of the parties' business relationship in Massachusetts, and would experience the consequences of this relationship in Massachusetts. As such, the Defendants purposely availed themselves of the laws and protections of the Commonwealth, and the personal jurisdiction that comes along with it.

14.    The court has jurisdiction to recognize, confirm, and enforce the Final Award, attached as **Exhibit A**, against the Defendants pursuant to 9 U.S.C. §§ 201 & 207 and M.G.L. c. 251, §§ 11 & 14.

15.    Venue in this forum is proper pursuant to M.G.L. c. 223, § 1.

## STATEMENT OF FACTS

### The Consulting Agreement and the JCAA Arbitration

16.    Mr. Conning and Defendant CJKI entered into a consulting agreement dated April 10, 2014 (the "**Consulting Agreement**").

17.   Under the Consulting Agreement, Mr. Conning and CJKI agreed that (a) Mr. Conning would assist CJKI in the editing of the CJKI Chinese Learner's Dictionary ("CCLD"); (b) the Parties would collaborate in the development of an app that would adapt Mr. Conning's course for learners of Chinese characters (the "HLC App". sometimes referred to in correspondence as the "iHLC") and (c) the Parties would collaborate in the development of an app for Mr. Conning's course for learners of Sino-Japanese characters (the "KLC App", sometimes referred to in correspondence as the "iKLC". and, together with the HLC App. the "Apps").

18.   The Consulting Agreement provided that disputes arising out of said agreement were subject to binding arbitration before the Japan Commercial Arbitration Association (the "JCAA Arbitration"). Mr. Conning requested such arbitration on December 21, 2015. The arbitration was formally opened in January 2016, and concluded on February 13, 2017 with the issuance of the Final Award.

19.   The JCAA appointed a sole arbitrator as its Tribunal to arbitrate the dispute between Mr. Conning and CJKI (the "JCAA Arbitrator"). The JCAA Arbitrator ruled in the Final Award that CJKI had breached both the CCLD portion and the Apps portion of the Consulting Agreement.

20.   The JCAA Arbitrator ruled in the Final Award that CJKI had inappropriately threatened Mr. Conning and withheld his compensation under the Consulting Agreement in an effort to force him to agree to an unfavorable amendment to the Consulting Agreement.

21.   The JCAA Arbitrator ruled in the Final Award that CJKI had violated their explicit and implicit obligations to Mr. Conning.

22.     The JCAA Arbitrator also determined that Mr. Conning's claims regarding both the
        CCLD portion and the Apps portion of the Consulting Agreement were valid and
        supported by the evidence, and that the counter-claims brought by CJKI were not valid or
        supported by the evidence.

23.     The JCAA Arbitrator further ruled that Mr. Conning had successfully terminated the
        Consulting Agreement on March 1, 2016, due to CJKI's breach of contract.

24.     The Final Award directs that "CJKI shall pay Mr. Conning the sum of $50,000, with
        interest thereon at the rate of 6% per annum from March 2, 2016, until the date of full
        payment thereof[.]"

25.     The Final Award also directs that "CJKI shall pay Mr. Conning the sum of 1,779,718
        Japanese yen in respect of costs of arbitration."

26.     CJKI made three payments to Mr. Conning toward the Final Award in 2017, covering the
        1,779,718 yen in arbitration costs plus $25,586.20 toward the compensatory portion of
        the Final Award, but has not made any payments since.

27.     Specifically, CJKI paid (a) 2,500,000 Japanese yen on July 31, 2017; 1,779,718 yen of
        which was applied to pay the awarded arbitration costs in full and 720,282 yen of which
        was applied to the $50,000 award, which was $6,542.32 at that day's exchange rate; (b)
        1,000,000 Japanese yen on August 5, 2017, which was $9,043.88 at the applicable
        exchange rate; and $10,000 on November 27, 2017.

28.     At 6% per annum interest calculated based on the amounts and dates of the partial
        payments set forth above, $6,448.11 in interest on CJKI's debt to Mr. Conning has
        accumulated since March 2, 2016, specifically (a) $4,233.30 between March 2, 2016 and
        July 31, 2017; (b) $35.70 between July 31, 2017 and August 5, 2017; (c) $705.96

between August 5, 2017 and November 27, 2017; and (d) $1,473.15 between November 27, 2017 to September 28, 2018.

29. Accounting for interest and payments to date, CJKI now owes Mr. Conning $30,861.91.

30. Because the claims made in the present complaint (namely, defamation, tortious interference with contractual and advantageous business relationships, and violations of M.G.L. c. 93A) do not arise from the terms of the Consulting Agreement, they are not subject to JCAA Arbitration. The present claims pertain to actions taken by the Defendants unrelated to the terms of the Consulting Agreement, including actions taken by the Defendants since the JCAA Arbitration concluded. Because Mr. Conning cannot seek to remedy the harms to him set forth in these claims through further JCAA Arbitration, he must instead seek protection from a court of law in this jurisdiction.

## Coercive and Defamatory Conduct

31. Defendants attempted to coerce Mr. Conning into abandoning his right to compensation pursuant to the Consulting Agreement and the Final Award and to agree to an unfavorable amendment to the Consulting Agreement by (a) making false accusations against Mr. Conning to his publisher Kodansha USA, Inc. ("**KUI**"), including false accusations that Mr. Conning improperly used CJKI data and (b) causing KUI to cease distribution of Mr. Conning's book. Specifically, in or around December 2017 or January 2018, the Defendants falsely told KUI that the Plaintiff improperly used CJKI data in the Plaintiff's book entitled the *Kodansha Kanji Learner's Course: A Step-by-step Guide to Mastering 2300 Characters* ("**KKLC**," also sometimes referred to in correspondence as "**KLC**"). The Defendants also falsely told KUI that Mr. Conning no longer had

permission to use the foreword in the KKLC that Mr. Halpern wrote specifically for the KKLC in exchange for publicity and other consideration.

32. CJKI and Mr. Halpern granted Mr. Conning permission to use the foreword in the KKLC by writing the foreword and providing it to Mr. Conning's editor with the understanding that it would appear in the KKLC.

33. Upon information and belief, Defendants made the false statements referenced in Paragraph 31, above, both orally and in writing.

34. The Defendants knew that the statements referenced in Paragraph 31 above, were likely to harm the Plaintiff in his business relationship with KUI and in his ability to earn royalties from his book, and that these harms had the potential to generate pressure that could help the Defendants avoid paying compensation owed to the Plaintiff.

35. The Defendants' false statements to KUI included the assertion that Mr. Conning had made unauthorized use of CJKI's Japanese kanji character data, including (a) entry numbers, (b) character readings, (c) character meanings, (d) radicals, (e) radical numbers, (f) stroke counts, (g) a readings index, and (h) a list of "similar characters" (collectively, the "**Kanji Character Data**").

36. CJKI and Mr. Halpern granted Mr. Conning permission to use the Kanji Character Data in the KKLC to the extent that any such permission was necessary. much of the Kanji Character Data not being subject to copyright.

37. The Defendants knew that their accusations concerning Mr. Conning's use of the Kanji Character Data were false when made, or at the very least made the allegations with a reckless disregard as to their truth. In fact, the Defendants had previously acknowledged that CJKI had granted permission for the KKLC to reprint a portion of CJKI's

copyrighted data from Mr. Halpern's *Kodansha Kanji Learner's Dictionary* ("**KKLD**"), including Kanji Character Data (a)-(c).

38.    The Defendants knew or should have known that the Kanji Character Data (d)-(f) was, and continues to be, public data that has never been owned by CJKI, and that CJKI has no basis for claiming a violation of a proprietary "rendering" of this data. For example, the Defendants' "rendering" of radicals and radical numbers in the KKLD closely resembles the rendering of such data in other dictionaries published long before either the KKLD or its parent dictionary.

39.    Mr. Halpern was aware that CJKI had granted Mr. Conning permission to use CJKI-prepared data in the KKLC readings index, since Mr. Halpern had himself directed CJKI staff to assist in preparing the readings index to be used in the KKLC.

40.    Mr. Halpern and CJKI either knew the allegations that they made to KUI regarding the list of similar characters (Kanji Character Data item (h) from Paragraph 35 above) were false when made, or at the very least, acted negligently in failing to ascertain whether the allegation that Mr. Conning used CJKI's similar character data was true before publishing it to KUI to the detriment of Mr. Conning.

41.    The Defendants' contemporaneous actions, their contemporaneous correspondence, and their pleadings before the JCAA Arbitrator make clear that the Defendants knew that the Plaintiff was entitled to use Kanji Character Data items (a) through (g) in making the KKLC.

42.    Mr. Halpern willingly contributed a glowing foreword for the KKLC. He did so after having thoroughly familiarized himself with the book's contents, including its use of the

Kanji Character Data. Mr. Halpern was therefore aware that his subsequent assertion that these data were used without the Defendants' authorization was false and defamatory.

43. Defendants made the false and defamatory statements about Mr. Conning discussed above to harm Mr. Conning, to damage his relationship with KUI, and to dissuade him from pursuing the Final Award payment owed to him by CKJI.

44. The Defendants' false accusations discussed herein were capable of damaging Mr. Conning's reputation, have in fact damaged his reputation, and continue to damage his reputation. In particular, Defendants' false accusations have damaged Mr. Conning's reputation in the East Asian language-learning publishing community, including among publishers and editors. By falsely telling KUI, a major publisher in Mr. Conning's industry, that Mr. Conning used another party's data without permission and that he misled his publisher, CJKI prejudiced Mr. Conning in his profession and interfered with his ability to make a living. These false accusations have already caused KUI to stop distributing the KKLC, and have interfered with Mr. Conning's ability to publish further works in the future, especially within the tight-knit East Asian language education community, the field in which Mr. Conning would otherwise have enjoyed his best commercial publishing opportunities.

45. Within the language education and academic communities of which Mr. Conning is a member, using someone else's work without permission is considered a serious offense and one who is accused of such an offense is the object of scorn and contempt, and is often excluded from the community and from opportunities within the community.

46. According to Mr. Halpern's own email, his accusation reached not only the Plaintiff's publisher in the United States (KUI), but also persons involved in the publishing industry in Tokyo, including persons involved with the former Kodansha International ("KI").

47. To the extent that future opportunities depend on a track record of success or trustworthiness, Defendants' interference with the publication and sale of the KKLC through their false accusations harms Mr. Conning's future publishing and business opportunities in other areas, such as his opportunities for publishing his planned books for learners of Chinese.

48. The Defendants' actions have harmed Mr. Conning both professionally and financially.

## Interference with Contractual and Advantageous Business Relationships

49. Mr. Conning has a contractual relationship with KUI whereby KUI is to print and distribute Mr. Conning's KKLC and under which Mr. Conning is to receive a royalty for each copy of the KKLC printed. Because more than 15,500 copies of the KKLC have been printed, Mr. Conning is entitled under the terms of his contract to receive a royalty of 8 percent of the book's retail price of $34 for each copy of the book that KUI prints, which works out to $2.72 per copy.

50. The Defendants knew since at least 2013 about the Plaintiff's relationship with KUI.

51. Because Mr. Halpern also publishes with KUI, he is well aware of the ways in which an author depends on such publishing relationships for business opportunities, including the opportunity to receive royalties, to publish revised editions, and to publish additional books.

52. In a May 18, 2018 email, Mr. Halpern threatened to harm Mr. Conning's relationship with KUI by convincing KUI that Mr. Conning's book contained "unauthorized data."

53.   At the time Mr. Halpern carried out this threat, he was aware that his allegations of
      unauthorized data use were false.

54.   Mr. Halpern carried out his threat to harm Mr. Conning's relationship with KUI by
      publishing his false accusation that Mr. Conning's book contained "unauthorized data" in
      multiple communications with KUI in mid-2015 and again in the period from
      approximately December, 2017 to mid-July, 2018.

55.   As a result of Mr. Halpern's publication of these false accusations, KUI pressured Mr.
      Conning in a series of communications first in mid-2015 and then again from January,
      2018 to the present to reach a settlement with CJKI (which would have involved
      accepting a smaller payment than he was due under the Final Award, or no payment at
      all), including suspending distribution of his book.

56.   Mr. Halpern was aware that his false allegations were likely to harm Mr. Conning's
      advantageous business relationship with KUI. In fact, Mr. Halpern specifically intended
      that his false accusations would harm Mr. Conning's relationship with KUI, as evidenced
      by his communications with Mr. Conning. For example, Mr. Halpern wrote in an email to
      Mr. Conning: "former KI advised that KUI remove KLC from the market at your
      expense[.] This option is obviously to your disadvantage, and will also bring KUI
      extreme unpleasantness, harming your relationship."

57.   The Defendants were aware that their false allegations were likely to interfere with Mr.
      Conning's ability to earn royalties from his book. In fact, Mr. Halpern had previously
      threatened in a series of emails in June of 2015 to take actions that would result in KUI's
      suspending sales of Mr. Conning's book.

58.   In a May 18, 2015 email from Mr. Halpern to Mr. Conning, Mr. Halpern threatened that,
      if Mr. Conning did not agree to an unfavorable amendment to the Consulting Agreement,
      Mr. Halpern would consider several options, including "request[ing] that KUI remove
      KLC from the market. Both KUI and former KI officials are aware of the unauthorized
      data. KUI will no doubt cooperate because of their unwillingness to use unauthorized
      data and because they greatly value our relationship."

59.   On June 3, 2015, Mr. Halpern wrote an email to Mr. Conning threatening that if Mr.
      Conning did not accede to Mr. Halpern's demands, Mr. Halpern would cause KUI to
      terminate publication of Mr. Conning's book, the KKLC: "Do yourself a favor and don't
      cause [KUI] any unpleasantness. Just like your shenanigans backfired with me, they will
      backfire with them with the result that they will no doubt pull KLC from the market."

60.   Two days later, on June 5, 2015, Mr. Halpern again emailed Mr. Conning threatening that
      his book would be withdrawn from the market if he did not yield to the Defendants'
      demands: "Just sign the agreement by June 15 and let's move forward. If you don't I
      suspect that KUI will withdraw KLC from the market and probably stop the press."

61.   The Defendants interfered with Mr. Conning's relationship with KUI by falsely telling
      KUI in mid-2015 and again in the period from approximately December, 2017 to mid-
      July, 2018 that Mr. Conning had used CJKI data without authorization.

62.   The Defendants' interference with Mr. Conning's relationship with KUI was willful,
      knowing, and intentional.

63.   The Defendants' actions have damaged Mr. Conning's relationship with KUI making it
      unlikely that KUI will work with Mr. Conning on other projects, which otherwise would
      have been likely to happen based on the resounding success of the KKLC.

64.     Upon information and belief, Mr. Conning has lost business opportunities as a result of the Defendants' interference with his relationship with KUI, including the expansion of the KKLC into a multi-volume series. Specifically, in a November 2016 meeting with KUI Marketing Director Laura Shatzkin, Mr. Conning outlined a major business proposal to KUI for revising and expanding the KKLC into such a series. However, Ms. Shatzkin expressed pessimism regarding the possibility of the project going forward because of KUI's concerns over Mr. Halpern's earlier claims that the KKLC contained data CJKI had not authorized. Mr. Conning followed up by sending KUI a new detailed written proposal the following month, which KUI did not accept. The expansion of the KKLC would have been worth at least an additional $20,000 per year to Mr. Conning had it gone forward, but it did not go forward as a direct result of Defendants' interference with the relationship between Mr. Conning and KUI.

65.     On January 18, 2018, Mr. Conning received a letter from KUI Chief Operating Officer Takashi Sakuda indicating that Mr. Halpern had claimed improper use of *"an enormous amount of...kanji data"* in the KKLC. Mr. Sakuda told Mr. Conning that under KUI's publishing contract with Mr. Conning, Mr. Conning was responsible for securing all permissions for the KKLC, and asked him to *"respond as soon as possible so that...KUI will not have to take any further action."*

66.     Mr. Conning replied the same day asking KUI to forward him the lists of data Mr. Halpern had claimed were used without permission, so that he could address KUI's concerns in full detail without leaving any of the data unaddressed. KUI declined to forward this information to Mr. Conning, instead asking Mr. Conning in a January 19, 2018 email to obtain the details of Mr. Halpern's claims directly from Mr. Halpern, and

then pressed Mr. Conning to "please submit to us written proof that you have permission
to use that data, as stated in your contract with KUI."

67.   Using information he had previously received from Mr. Halpern, Mr. Conning promptly
refuted each claim appearing in KUI's January 18, 2018 email in a document he sent to
KUI on January 25, 2018.

68.   KUI continued to press Mr. Conning to settle his disputes with Mr. Halpern and CJKI
even after he had refuted Mr. Halpern's claims. Referring to the unresolved situation
created by CJKI and Mr. Halpern's false allegations that Mr. Conning used unauthorized
data in the KKLC, KUI wrote in a February 23, 2018 email to Mr. Conning: "This
situation must get resolved as soon as possible. If you and Jack can't come to a settlement,
we'll have to take further action – and that's not going to be to anyone's advantage.
Again, we're urging you to be in contact with Jack and work this out."

69.   On March 8, 2018, KUI wrote to Mr. Conning, making clear that KUI would take action
against Mr. Conning's interests if he did not settle the matter with Mr. Halpern and CJKI:
"Again, we're urging you to do everything possible to get this settled between the two of
you. If we're put in the position of having to take further action, it will be to no one's
benefit."

70.   Mr. Conning had, in fact, done everything possible to resolve his dispute with CJKI and
Mr. Halpern since immediately after the Final Award, but Mr. Halpern had refused either
to fulfill the terms of the Final Award or to accept an alternative compensation proposal
offered by Mr. Conning. Instead, Mr. Halpern continued to threaten in a May 18, 2018
email that if Mr. Conning did not accept Mr. Halpern's terms, Mr. Halpern would have
KUI "remove KLC from the market." Mr. Halpern and CJKI's approach was not to

negotiate in good faith, but rather to bully Mr. Conning in hopes that the threats to his relationship with KUI would cause him to abandon collection of the Final Award.

71.    The Defendants' actions caused KUI to remove KKLC from the market.

72.    On July 17, 2018, KUI wrote to Mr. Conning, informing him that it had suspended distribution of the KKLC until such time as Mr. Conning agreed to a settlement with Mr. Halpern and CJKI.

73.    Mr. Conning has suffered and continues to suffer economic losses of over $80 per day from the date of suspension on or about July 17, 2018, as a direct result of KUI's suspension of distribution of the KKLC.

## Other Unfair and Deceptive Conduct

74.    In a series of emails in March, April, and October of 2017, the Defendants threatened Mr. Conning that if he pursued his legal right to enforce the Final Award, CJKI would declare bankruptcy and he would get nothing.

75.    Rather than being insolvent, Defendant CJKI has simply prioritized other expenditures over paying Mr. Conning the amount owed to him pursuant to the Final Award. CJKI used the extra liquidity from its unpaid debt to Mr. Conning to pay for high-level professional services and to expand into a new area of business activity. Specifically, since issuance of the Final Award on February 13, 2017, CJKI has not only maintained its corporate staff, but has also engaged accountants, lawyers, "professional management consulting companies," and a "top management expert," and has launched a new area of business activity in the field of artificial intelligence.

76.    By using funds owed to Mr. Conning to expand its own business, CJKI left Mr. Conning in a state of financial distress, thereby preventing him from pursuing similar opportunities.

In so doing CJKI has shown an unfair and unscrupulous disregard for the consequences it has caused Mr. Conning.

77.    The Defendants attempted to pressure Mr. Conning into accepting partial payment by claiming they lacked the resources to pay the Final Award. Mr. Conning spent many hours of work time and incurred considerable additional legal expenses both in attempting to collect the Final Award and in attempting to arrange an alternative settlement in response to the Defendants' claim that they could not pay. However, it later came to light that the Defendants in fact had access to liquid assets that could have been used to pay the Final Award. The Defendants misled Mr. Conning regarding their capacity to pay, causing him additional legal expenses and loss of time. It also came to light that Mr. Halpern had engaged in extended international travel during this period, while the Plaintiff remained unpaid and therefore unable to afford such travel himself.

78.    The Defendants have employed threats and deceit to force Mr. Conning to spend over 120 hours in lost work time to pursue the amount owed to him under the Final Award. These lost work hours have kept him and his family in a prolonged state of financial distress. The Defendants have repeatedly sought to contrive artificial delays, attempting in bad faith to convey the impression that they were attempting to fulfill their obligations and were somehow being blocked by Mr. Conning from doing so. To compound these injuries, the Defendants have repeatedly accused Mr. Conning of preventing them from complying with the Final Award. Moreover, the Defendants have laced these deceitful accusations with insults and efforts to intimidate the Plaintiff, including by threatening to interfere with this relationship with KUI and then carrying out that threat.

79.    Mr. Conning would have been compensated at a rate of at least $80 per hour for work performed during the hours that were lost as a result of Defendants' actions.

80.    The Defendants have repeatedly made false promises that payment of the debt was imminently forthcoming. Mr. Conning has been deceived by these promises into believing that he might soon be able to repay his own creditors. The Defendants made these promises repeatedly, including in February, March, April, July, August, October, November, and December of 2017, as well as February, March, April, and May of 2018.

81.    The Plaintiff has suffered serious harms as a result of the unfair and deceptive conduct detailed herein. Among these are (a) spending over 120 hours pursuing payment or settlement by CJKI over the course of the past 18 months; (b) incurring an estimated $7,000 in legal expenses as a result of his reliance on Defendant's false promises and false statements; (c) being diverted from pursuing employment due to coping with Defendant's defamatory accusations, failure to pay the judgment, and interference with his business relations with KUI; (d) suffering emotional distress as a result of the malicious false and defamatory accusations and insults leveled against him by Defendants; (e) missing out on potential lucrative business opportunities due to the lack of time and resources caused by Defendants' actions; (f) suffering emotional distress at seeing his elderly parents live in impoverished circumstances—and his mother pass away—while he remained unable to begin repaying the loan his parents extended to help his family survive the ongoing financial disaster caused to him by the Defendants.

## COUNT I – DEFAMATION

82.    Mr. Conning re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 81, above.

83. The Defendants' statements alleged herein were false statements of fact concerning the Plaintiff.

84. The Defendants knew or had reason to know that the statements alleged were false when made.

85. The Defendants acted with a reckless disregard with respect to alleged statements' truth or falsity.

86. The Defendants negligently disseminated and published the alleged statements to third parties.

87. The Defendants' statements were disseminated and published to third parties, including KUI, former officers of KI, and others.

88. Upon information and belief, the Defendants' alleged statements were made orally and in writing.

89. The Defendants' alleged statements constitute libel and slander *per se*.

90. The Defendants' alleged statements are capable of damaging the plaintiff's reputation in the community, specifically, the professional community of East Asian language education.

91. Mr. Conning has endured mental suffering as a result of the Defendants' defamatory statements.

92. The Defendants' statements harmed and continue to harm Mr. Conning's reputation and caused Mr. Conning pecuniary harm in an amount to be determined at trial.

## COUNT II – TORTIOUS INTERFERENCE WITH CONTRACTUAL/ADVANTAGEOUS BUSINESS RELATIONSHIPS

93. Mr. Conning re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 92, above.

94.   Mr. Conning had an advantageous business relationship with KUI whereby KUI would distribute and sell his book, the KKLC, on the open market.

95.   Mr. Conning has and continues to be denied the benefit of the bargain of this contract with KUI due to the Defendants' interference, as described herein.

96.   But for the Defendants' alleged interference herein, Mr. Conning had prospective business opportunities with KUI with respect to new books and publications.

97.   The Defendants knew of Mr. Conning's KKLC distribution relationship and prospective business opportunities with KUI.

98.   The Defendants knowingly interfered with Mr. Conning's relationship with KUI through improper motive and means. Mr. Halpern believed the interference detailed herein had the potential to generate pressure that could benefit CJKI and protect it from the consequences of its previous wrongdoing. For example, he believed that the threat of having the KKLC removed from the market would force Mr. Conning to sign an unfavorable amendment to the Consulting Agreement in 2015 and to abandon his rights to payment to the amount owed him by CJKI pursuant to the Final Award in 2017 and 2018.

99.   The Defendants knowingly damaged Mr. Conning's relationship with KUI, causing KUI to discontinue distributing and selling Mr. Conning's book, the KKLC, and, upon information and belief, causing KUI not to accept Mr. Conning's business proposals.

100.  Mr. Conning has suffered and continues to suffer damages as a result of the Defendants' conduct.

### COUNT III – G.L. c. 93A (unfair or deceptive trade practices)

101.    Mr. Conning re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 99, above.

102.    The parties are engaged in the conduct of trade or commerce within the meaning of G.L. c. 93A to the extent such conduct is required for the Plaintiff's G.L. c. 93A claim.

103.    A demand letter was not required for purposes of G.L. c. 93A, § 9 to institute this claim because the Defendants do not maintain a place of business or do not keep physical assets within the Commonwealth.

104.    The unfair and deceptive trade practices described herein, and the effects of those practices, occurred primarily and substantially within the Commonwealth of Massachusetts for purposes of G.L. c. 93A, § 11 to the extent § 11 applies.

105.    The acts and practices described herein constitute unfair and/or deceptive acts within the meaning of G.L. c. 93A.

106.    Mr. Conning has been damaged and continues to suffer damages as a result of the Defendants' unfair and/or deceptive acts and practices.

## COUNT IV – RECOGNIGITION, CONFIRMATION, AND ENFORCEMENT OF ARBITRATION AWARD PURSUANT TO 9 U.S.C. §§ 201 & 207 and M.G.L. c. 251, §§ 11 & 14

107.    Mr. Conning re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 105, above.

108.    Mr. Conning obtained the Final Award, attached hereto as **Exhibit A**,[1] against the Defendants as a result of arbitration proceedings held by the JCAA Arbitrator.

109.    The Final Award is in writing and was signed by the JCAA Arbitrator.

---

[1] Mr. Conning will provide a certified copy of the Final Award upon request by the Court.

110. The arbitration provision upon which the JCAA arbitration proceedings arose is a valid and enforceable provision. A true and accurate copy of the contract that contains the arbitration provision is attached hereto as **Exhibit B.**

111. The Final Award arose out of a commercial legal relationship.

112. Japan is a contracting state of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

113. Pursuant to 9 U.S.C. §§ 201 & 207, M.G.L. c. 251, §§ 11& 14, and common law, this Court has jurisdiction to recognize, confirm, and enforce the Final Award, by way of judgment, against the Defendants.

114. To date, CJKI has failed to pay $30,861.91 of the amount it owes Mr. Conning pursuant to the Final Award.

115. This confirmation request is made within 3 years of the Final Award.

## <u>REQUESTS FOR RELIEF</u>

WHEREFORE, Mr. Conning respectfully requests that this Court:

1. Recognize, confirm, and enforce Mr. Conning's arbitration award, attached hereto as **Exhibit A,** by providing a judgment on the award and ordering defendant CJK Dictionary Institute, Inc. to pay the remaining $30,861.91 of the Final Award to Mr. Conning plus applicable pre-judgment interest, calculated pursuant to M.G.L. c. 231, §§ 6B and 6H.

2. Preliminarily and permanently enjoin the Defendants from publishing further defamatory statements concerning Mr. Conning and from interfering with Mr. Conning's present and prospective business relationships, including without limitation, Mr. Conning's relationship with Kodansha USA, Inc.;

3. Order the Defendants to retract all defamatory statements directly or indirectly concerning Mr. Conning by notifying Kodansha USA, Inc. and any other third parties that received such statements that Mr. Conning did not use unauthorized data in his books or other publications.

4. Order the Defendants to provide Kodansha USA, Inc. any necessary permissions it needs to continue publishing Mr. Conning's book The Kodansha Kanji Learner's Course: A Step-by-Step Guide to Mastering 2300 Characters.

5. Enter judgment for Mr. Conning on all Counts of this Complaint;

6. Award Mr. Conning damages as determined at trial, plus interest and costs as provided by law;

7. Award Mr. Conning double and/or treble damages as permitted by law, plus his reasonable attorneys' fees and costs; and

8. Grant Mr. Conning any such other relief as this Court deems just and proper.

## JURY DEMAND

Mr. Conning demands a jury trial on all issues so triable.

DATED: September 28, 2018

Respectfully submitted,
Plaintiff
Andrew Scott Conning,
By his attorneys,

Kenneth R. L. Parker (BBO #688987)
Shaun P. Keough (BBO #688868)
Nathaniel J. Lichtin (BBO #692764)
PARKER KEOUGH LLP
*Street Address:*
  51 Winchester St., Suite 205
  Newton, MA 02461
*Mailing Address:*
  P.O. Box 590006

Newton, MA 02459
Tel.: (617) 841-2418
Fax.: (617) 963-8315
E-mail: kparker@parkerkeough.com

Exhibit A

IN THE MATTER OF AN ARBITRATION UNDER THE

2015 RULES OF

THE JAPAN COMMERCIAL ARBITRATION ASSOCIATION

Arbitration Case No. 15-13, Tokyo

BETWEEN:


MR. ANDREW SCOTT CONNING (USA)

Claimant


- and -

THE CJK DICTIONARY INSTITUTE, INC. (JAPAN)

Respondent


---

**FINAL AWARD**

---


Place of Arbitration:  Tokyo, Japan

The Arbitral Tribunal:  Douglas Kenji Freeman, Sole Arbitrator

February 13, 2017

## TABLE OF CONTENTS

I INTRODUCTION ................................................................................................ 3
  Preamble ........................................................................................................ 3
  The Parties and Their Representatives .......................................................... 3
  Arbitration Agreement and Governing Law ................................................. 3
II COMMENCEMENT OF ARBITRATION AND JURISDICTION ........................... 4
  Commencement of the Arbitration ............................................................... 4
  Appointment of the Tribunal ........................................................................ 4
  Language of Arbitration ................................................................................ 4
  Preliminary Meeting ...................................................................................... 5
  Interim Decision on Governing Law ............................................................. 5
  Claimant Memorial and Request for Amendment ........................................ 6
  Subsequent Proceedings ............................................................................... 6
  Second Preliminary Meeting ......................................................................... 7
  Further Proceedings ...................................................................................... 8
  Conclusion of Examination ........................................................................... 9
III STATEMENT OF FACTS AND PARTIES' CLAIMS ........................................... 10
  Summary Overview of Case .......................................................................... 10
  Mr. Conning's Claims ................................................................................... 10
  CJKI's Rebuttals ........................................................................................... 12
  CJKI's Counterclaim ..................................................................................... 14
IV ISSUES TO BE DETERMINED ........................................................................ 15
  Interpretation of the Consulting Agreement ............................................... 16
  Editing Work on the CCLD ........................................................................... 16
  The KLC and HLC Apps ................................................................................ 17
  Termination of the Consulting Agreement .................................................. 17
  Quantum of Loss .......................................................................................... 17
V DISCUSSION AND DECISION ......................................................................... 18
  Editing Work on the CCLD ........................................................................... 18
  The KLC and HLC Apps ................................................................................ 18
  Termination of the Consulting Agreement .................................................. 21
  Quantum of Loss .......................................................................................... 22
  CJKI Counterclaim ....................................................................................... 22
  Late Payment Interest .................................................................................. 24
  Costs of Arbitration ...................................................................................... 25
AWARD ................................................................................................................. 25
  ................................................................................................................ 26

In the matter of the Japan Commercial Arbitration Association Arbitration Case No. 15-13, Tokyo between MR. ANDREW SCOTT CONNING as Claimant, and THE CJK DICTIONARY INSTITUTE, INC. as Respondent

## FINAL AWARD

## I   INTRODUCTION

### Preamble

1    This arbitration is a dispute over a collaborative project between the Parties set forth in a Consulting Agreement relating primarily to the editing work which was to be conducted by Claimant, Mr. Andrew Scott Conning ("**Mr. Conning**"), on a dictionary for learners of Chinese hanzi and the obligations of Respondent, the CJK Dictionary Institute, Inc. ("**CJKI**"), under that agreement, including the development of software applications for Mr. Conning's kanji courses, in which each Party asserts claims for damages based on the breach of the opposing Party's obligations.

### The Parties and Their Representatives

2    Mr. Conning is a US national whose profession is educational management, educational consulting, and linguistic education.

3    Mr. Conning's street address is:

> Holden Green 203-C
> Cambridge, MA 02138
> U.S.A.

4    Mr. Conning is represented by Herbert Smith Freehills LLP, located at:

> 41st Floor, Midtown Tower
> 9-7-1 Akasaka, Minato-ku
> Tokyo 107-6241
> Japan

Counsel representing Mr. Conning are Peter Godwin, Esq. and Sophie Kitchener, Esq.

5    CJKI is a Japanese corporation which specialises in developing lexical databases for the Chinese, Japanese and Korean languages.

6    CJKI's representative is Mr. Jack Halpern, CEO ("**Mr. Halpern**").

7    CJKI's street address is:

     Komine Building
     2-chome, 34-14
     Tohoku, Niiza-shi, Saitama 352-0001
     Japan

8    CJKI is represented by Kamano Sogo Law Offices, located at:

     NBF Hibiya Building 14F
     1-1-7 Uchisaiwai-cho
     Chiyoda-ku, Tokyo 100-0011
     Japan

Counsel representing CJKI is Takehiko Watanabe, Esq.

## Arbitration Agreement and Governing Law

9    This arbitration was brought under an arbitration agreement (the **"Arbitration Agreement"**) set forth in Section 4.5 of the Consulting Agreement entered into between the Parties dated April 12, 2014 (the **"Consulting Agreement"**) which provides as follows:

> "4.5 Any dispute or claim arising out of this Agreement shall be settled by binding arbitration in Tokyo, Japan in accordance with the Commercial Arbitration Rules of the Japan Commercial Arbitration Association."

10   Further to the Arbitration Agreement, the procedural rules governing these arbitral proceedings are the Japan Commercial Arbitration Association Commercial Arbitration Rules (as amended and effective on December 10, 2015) (the **"Rules"**).

11   The Consulting Agreement does not contain a governing law clause, which issue is addressed below.

## II   COMMENCEMENT OF ARBITRATION AND JURISDICTION

## Commencement of the Arbitration

12   These proceedings were initiated on December 21, 2015, when Mr. Conning submitted a Request for Arbitration (the **"Request"**) to the Japan Commercial Arbitration Association (the **"JCAA"**).

## Appointment of the Tribunal

13   In a letter dated February 3, 2016, the JCAA notified the Parties pursuant to Rule 26.1

of the Rules that the number of arbitrators shall be one considering both Parties' views that one arbitrator would be appropriate for these proceedings.

14  Because the Parties failed to notify the JCAA of their agreement to appoint an arbitrator within the specified time period, the JCAA appointed the following sole arbitrator (the **"Sole Arbitrator"**) in a letter dated February 18, 2016, pursuant to Rule 27.3 of the Rules:

Douglas Kenji Freeman, Esq.

15  The Sole Arbitrator's office address is:

Law Offices of Douglas K. Freeman
Toranomon Hills Mori Tower 6F
1-23-1 Toranomon, Minato-ku
Tokyo 105-6306, Japan

## Language of Arbitration

16  The Parties had not agreed on the language of the arbitration in the Arbitration Agreement.  Therefore, after considering both Parties' submissions regarding the issue, including Claimant's Request for Arbitration dated December 21, 2015, Claimant's Letter to the JCAA dated February 10, 2016, Respondent's Answer (答弁書) and Counterclaim (反対請求の申立書) each dated February 1, 2016, and Respondent's Submission to the JCAA (上申書) dated February 15, 2016, the Sole Arbitrator issued Procedural Order No. 1 dated March 4, 2016, in which it determined that the language of the arbitration shall be English pursuant to Rule 11.1 of the Rules.

## Preliminary Meeting

17  On April 19, 2016, the Sole Arbitrator held a preliminary meeting (the **"Preliminary Meeting"**) to discuss the arbitral proceedings and other matters from 2:00 to 4:30 pm Tokyo time at the office of the Sole Arbitrator.

18  The following participants were present at the Preliminary Meeting:

The Sole Arbitrator:
    Douglas Kenji Freeman
    Ayako Tsuru (unofficial Administrative Secretary)

| Mr. Conning: | Mr. Conning's Counsel: |
| | Mr. Peter Godwin / Ms. Sophie Kitchener / |
| | Ms. Stephanie Batsakis of Herbert Smith Freehills |
| CJKI: | Mr. Jack Halpern, Representative Director of CJKI |
| | Respondent's Counsel: |
| | Mr. Takehiko Watanabe of Kamano Sogo Law Offices |

19    At the Preliminary Meeting, the Parties discussed the items contained in the Agenda and in draft Procedural Order No. 2 circulated in advance, including a number of means to proceed efficiently in light of the relatively limited size of the dispute. Among other matters, the Parties agreed to the Procedural Schedule under Rule 39.2 of the Rules and a draft List of Major Issues under Rule 40.2 of the Rules. In the interest of efficiency, the Parties agreed to generally dispense with document production procedures and to consider dispensing with an evidentiary hearing and having the Sole Arbitrator issue an award without reasons under Rule 61.3 of the Rules, to be confirmed at a later date after both Parties had made their principal submissions.

20    Following the Preliminary Meeting, the Sole Arbitrator issued Procedural Order No. 2 dated April 27, 2016, setting forth the procedures for this arbitration, including the Procedural Schedule and the adoption of the IBA Rules on the Taking of Evidence in International Arbitration (2010) as guidelines for the proceedings, subject to modifications to be made in the Sole Arbitrator's discretion.

## Interim Decision on Governing Law

21    Because the Consulting Agreement did not specify the governing law, or the law "applicable to the substance of the dispute" under Rule 60.1 of the Rules, the Sole Arbitrator in a letter to the Parties dated March 7, 2016, requested the Parties to submit their assertions relating thereto. In their respective submission dated April 13, 2016, Mr. Conning asserted that the law of Massachusetts of the United States shall apply, and CJKI asserted that the law of Japan shall apply.

22    In an Interim Decision dated April 28, 2016, the Sole Arbitrator determined that the governing law shall be Japanese law pursuant to Rule 60.2 of the Rules.

## Claimant Memorial and Request for Amendment

23    On June 27, 2016, Mr. Conning submitted the Claimant Memorial (the "Claimant

Memorial") accompanied by the Witness Statement of Mr. Andrew Scott Conning dated June 27, 2016.

24   In an e-mail to the Parties dated July 13, 2016, the Sole Arbitrator noted that the Claimant Memorial contained an amendment to Claimant's claim and requested that Mr. Conning submit a Request for Amendment under Rule 21.1 of the Rules. On July 15, 2016, Mr. Conning submitted to the JCAA a Request for Amendment to Claim and a request for approval of the Tribunal to amend its claim (the **"Request for Amendment"**). Mr. Conning's claims before and after such amendment are set forth below. On July 21, 2016, CJKI submitted Respondent's Comments on the Request for Amendment to Claim.

25   Having reviewed both Parties' comments regarding the Request for Amendment, in an Interim Decision dated August 2, 2016, the Sole Arbitrator approved Claimant's Request for Amendment and held that the Tribunal had jurisdiction over the Amended Claim.

## Subsequent Proceedings

26   On August 8, 2016, CJKI submitted Respondent Reply to the Claimant Memorial and Respondent Memorial Regarding Counterclaim, accompanied by the Witness Statement of Jack Halpern and the Witness Statement of Nicola Mettifogo, each dated August 8, 2016.

27   In an e-mail dated August 24, 2016, the Parties notified the Sole Arbitrator that they had agreed that no expert witness would be required for this arbitration and proposed that the preliminary meeting scheduled for August 29, 2016, to discuss expert witnesses be vacated. The Sole Arbitrator agreed to vacate that meeting.

28   On September 16, 2016, Mr. Conning submitted Claimant Rejoinder Memorial and Reply to Counterclaim, accompanied by the Second Witness Statement of Mr. Andrew Scott Conning dated September 15, 2016.

29   On October 31, 2016, CJKI submitted Respondent Rejoinder Memorial (the **"Respondent Rejoinder Memorial"**) accompanied by the Second Witness Statement of Jack Halpern and the Second Witness Statement of Nicola Mettifogo, each dated October 31, 2016.

30 On November 1, 2016, Mr. Conning submitted a Letter to the Sole Arbitrator objecting to CJKI's submission to evidence of a document entitled "Survey of Opinions on Chinese Linguistic Issues" accompanying the Respondent Rejoinder Memorial (Ex. R-165; the "Survey"). On November 4, 2016, CJKI submitted a letter responding to Mr. Conning's objections.

31 On November 4, 2016, having reviewed both Parties' submissions on the issue, the Sole Arbitrator in an e-mail to the Parties determined not to accept the Survey into evidence in consideration of the agreement between the Parties in paragraph 27 above.

## Second Preliminary Meeting

32 On November 7, 2016, the Sole Arbitrator held a second preliminary meeting (the "Second Preliminary Meeting") from 9:00 to 9:30 am Tokyo time at the office of the Sole Arbitrator.

33 The following participants were present at the Second Preliminary Meeting:

The Sole Arbitrator:
        Douglas Kenji Freeman
        Ayako Tsuru (unofficial Administrative Secretary)

Mr. Conning:    Mr. Conning's Counsel:
        Mr. Peter Godwin / Mses. Jean Hamilton-Smith and
        Victoria Green of Herbert Smith Freehills

CJKI:    Mr. Jack Halpern, Representative Director of CJKI
        CJKI's Counsel:
        Messrs. Takehiko Watanabe and Kazuhiro Matsumura of
        Kamano Sogo Law Offices

34 At the Second Preliminary Meeting, the Sole Arbitrator confirmed the Parties' agreement that (i) the Evidentiary Hearing planned to be held on December 5, 2016, would be vacated and the Sole Arbitrator would make a determination on a "documents only" basis, and (ii) the Sole Arbitrator would issue an award without reasons, subject to providing an abbreviated reasoning outlining the Sole Arbitrator's determination process.[1]

---

[1] The Parties subsequently submitted a signed Stipulation by the Parties regarding an Award without Reasons dated November 14, 2016.

35    The Sole Arbitrator also explained that it believed that because the Parties had
      provided detailed assertions regarding the quality of the work in question as well as
      contemporaneous documents regarding the surrounding circumstances, the Sole
      Arbitrator believed that it would not require an expert witness, but would consult
      with the Parties if it later considered an expert to be beneficial.  The Parties agreed to
      this suggestion.

**Further Proceedings**

36    On November 14, 2016, as requested by the Sole Arbitrator at the Second
      Preliminary Meeting, CJKI submitted Respondent's Request for Amendment to
      Counterclaim withdrawing and modifying certain remedies previously asserted.  In an
      e-mail to the Parties dated November 16, 2016, the Sole Arbitrator approved CJKI's
      Amended Counterclaim and, as previously agreed with the Parties, stated that it will
      dispense with the procedural requirements under Rule 21 of the Rules, including the
      need for Mr. Conning to file an Answer in response thereto and will regard Mr.
      Conning's prior submissions to apply to the Amended Counterclaim.

37    On November 18, 2016, the Parties submitted a modified Draft Agreed List of Major
      Issues Prepared for Purpose of a Decision on the Papers (the "**List of Major Issues**").

38    In an e-mail dated December 28, 2016, CJKI asserted that although the Sole
      Arbitrator stated at the Preliminary Meeting in April that it did not intend to include
      legal fees in the allocation of costs under Rule 83.1, due to the changed
      circumstances since that meeting, CJKI requests that the Sole Arbitrator include legal
      fees in such allocation.  In an e-mail dated December 29, 2016, Mr. Conning
      commented on CJKI's request.

39    In an e-mail dated January 3, 2017, the Sole Arbitrator advised the Parties that it
      maintained its initial view that an award of legal fees was not warranted, but that it
      reserved the right to reconsider the issue if needed.

40    In an e-mail dated January 20, 2017, the Sole Arbitrator provided the Parties with a
      draft agreed Summary of Facts which the Parties commented on and agreed by e-
      mails of January 26 and 27, 2017.  In the following e-mail, the Sole Arbitrator also
      advised the Parties of two Japanese Supreme Court cases which the Tribunal may
      take into consideration as being relevant to the issues.

41    In a further e-mail dated January 23, 2017, the Sole Arbitrator asked the Parties to
      confirm whether they intended to assert late payment interest (*chien-songaikin*) on
      their respective claims, and received confirmation in e-mails from each Party dated
      January 25, 2017, that they intended to claim late payment interest (i) at the
      statutory rate of six percent (6%) (Arts. 514 and 502(2) of the Japanese Commercial
      Code)[2], (ii) from the day following their respective claims of contractual termination
      (i.e., March 1, 2016, in case of Mr. Conning; and August 8, 2016, in case of CJKI).

**Conclusion of Examination**

42    Following a full and careful examination of the Parties' submissions and evidence and
      having determined that the proceedings have matured enough for the Sole Arbitrator
      to render an arbitral award, the Sole Arbitrator concluded the examination pursuant
      to Rule 56.1 of the Rules as of the end of the business day in Tokyo on February 10,
      2017, after providing advance notice to the Parties in an email dated February 1,
      2017.

## III   STATEMENT OF FACTS AND PARTIES' CLAIMS

**Summary Overview of Case**

43    The following paragraphs provide an overview of the facts upon which this dispute is
      based, as agreed between the Parties.[3] Additional relevant facts are discussed more
      specifically in the context of the Sole Arbitrator's consideration of particular issues.

44    The business relationship between Mr. Conning and Mr. Halpern dates back to 2008,
      when a contract was entered into between Mr. Conning's publisher and Mr. Halpern
      for the use of certain data from Mr. Halpern's "Kodansha Kanji Learner's Dictionary"
      in Mr. Conning's book, eventually published under the title "The Kodansha Kanji
      Learners' Course."

45    Further to discussions between Mr. Conning and Mr. Halpern in a number of
      meetings, Mr. Conning and CJKI entered into the Consulting Agreement dated April
      12, 2014, under which they agreed that (i) Mr. Conning would assist CJKI in the
      editing of the CJKI Chinese Learner's Dictionary ("**CCLD**"), (ii) the Parties would

---

[2]   Act No. 48 of March 9, 1899 (as amended).

[3]   See para. 40 above.

collaborate in the development of an app that would adapt Mr. Conning's kanji course for learners of Chinese hanzi (the "**HLC App**") and an app for Mr Conning's kanji course for learners of Japanese (the "**KLC App**", and, together with the HLC App, the "**Apps**").

46    The Parties dispute the scope of their respective obligations under the Consulting Agreement, in particular the obligations of Mr. Conning under the provision, which states:

"His main task includes but is not limited to editing ('vertical editing'), and proofreading of [the CCLD] and related tasks . . . "  Exhibit CCLD, Article 1.

47    Under the Consulting Agreement, Mr. Conning's compensation for editing the CCLD as set forth in "Exhibit: CCLD" was a total of US$35,000, consisting of two payments of US$5,000 each as an "advance," and "a royalty of 10%" on sales of the CCLD up to the sum of US$25,000.

48    The Parties dispute whether the revenue sharing scheme for the Apps was part of the compensation for editing the CCLD under the phrase "as an integral part of this compensation agreement, the parties agree to a revenue sharing scheme for the smart platform apps described in Appendixces [sic] 1 and 2." Exhibit CCLD, Article 3.

With regard to the development of the Apps by CJKI, the Consulting Agreement contains the following revenue-sharing provisions:

"iHLC App [HLC App]:  Upon release of the iHLC App, the Company will be entitled to 100% of net revenues until 100% of its development costs for the iHLC App have been recovered.  Thereafter, the parties will share earnings in a 60%-40% ratio of the net revenues (60% to Consultant and 40% to Company)."  Appendix 1: iHLC App, Article 8.

"KLC App:  The parties commit themselves to a revenue sharing scheme of 60%-40% of the net revenues for the KLC App (60% to Company and 40% to Consultant), until such time as the Company has recovered 100% of its investment costs for the KLC App through royalties.  Thereafter, the parties will split all KLC App revenues 50%-50%.  The parties also commit themselves to a scheme of mutual referral fees, the details of which are to be agreed on."  Appendix 2: KLC App, Article 7.

49    With regard to the editing work for the CCLD, Mr. Conning received the first file of data on February 25, 2014 ("**File 1**"), and submitted an initial edited version of the file to CJKI on June 10, 2014, and a revised file on October 27, 2014.  Mr. Conning

received a second file data on June 25, 2014 ("File 2"), and submitted an initial edited version of the file to CJKI on September 2, 2014, and a revised file on May 21, 2015. Among a total of five files, the remaining three files were ultimately not provided to Mr. Conning due to the dispute that arose between the Parties.

50    With regard to the Apps, Mr. Conning provided certain specifications for the KLC App to CJKI on April 16, 2014, and initial draft data for the KLC App on June 23, 2014. CJKI produced the first development version or "build" of the KLC App on or around June 15, 2014, followed by subsequent builds in July 2014. But the data was not finalized and the development process was not completed for the KLC App due to the dispute that arose between the Parties. No development was performed by either Party regarding the iHLC App.

**Mr. Conning's Claims**

51    Mr. Conning asserts that CJKI breached its contractual obligations under the Consulting Agreement, including:

(i)    an unreasonable rejection of work performed by Mr. Conning, and consequent unreasonable refusal to remunerate Mr. Conning under the terms of the Consulting Agreement, for editing his work on the CCLD;

(ii)    obstructing communications between Mr. Conning and CJKI employees;

(iii)    pressuring Mr. Conning to accept an unfavorable contract amendment;

(iv)    late payment of the advance of US$5,000, to be paid to Mr. Conning no later than June 1, 2014;

(v)    failing to provide data files for editing;

(vi)    failing to provide adequate instructions; and

(vii)    repeatedly suspending production of the KLC App, and failing to develop the KLC App and consequently the HLC App.

**Initial Remedy Sought**

52    Based on the foregoing, Mr. Conning initially demanded the following relief in his Request:

    (i)    The remaining US$30,000 currently owing to Mr. Conning under the Consulting Agreement following CJKI's repudiatory breach of contract resulting in Mr. Conning being unable to complete the work for which he should have been remunerated;

    (ii)   An award in the sum it would cost to engage another company to develop Mr. Conning's Apps, estimated to be US$67,000; and

    (iii)  Loss of profits resulting from CJKI's failure to produce Mr. Conning's Apps in a timely fashion;

or, in the alternative;

    (iv)  Compensation of US$55,250 for the 650 hours of work Mr. Conning performed for CJKI at an hourly rate of US$85 (being the appropriate rate discussed between the Parties); and

    (v)   Loss of profits resulting from CJKI's failure to produce Mr. Conning's Apps in a timely fashion.

53    If the Sole Arbitrator determined that Massachusetts law was the applicable governing law, and that CJKI's breach of contract and breach of the implied covenant of good faith and fair dealing constitutes an unfair business practice, as defined by Chapter 93A of Massachusetts General Law, then in addition, Mr. Conning seeks triple damages, costs and attorney's fees.

54    Mr. Conning is willing to accept intellectual property rights and a functional version of the KLC App in place of some portion of the financial damages he is owed.

55    Mr. Conning also seeks such further or other relief orders or declarations as the Tribunal may deem appropriate.

### Amended Claim and Remedy Sought

56    Subsequently, further to the Request for Amendment, Mr. Conning seeks the following relief:

    (i)    The remaining US$30,000 owed to Mr. Conning under the Consulting Agreement;

    (ii)   An award for US$407,500 for the cost of developing the KLC App; and

(iii) An award for US$135,833 for the cost of developing the HLC App (calculated at one-third of the cost to develop the KLC App);

resulting in a total claim of US$573,333.

57    In his Request, Mr. Conning also stated that he was willing to accept intellectual property rights and a functional version of the KLC App in place of some portion of the financial damages he is owed. Mr. Conning no longer seeks this remedy in his Amended Claim.

**CJKI's Rebuttals**

58    In response to Mr. Conning's claims, CJKI argues that Mr. Conning's editing work on File 1 and File 2 contained various errors constituting a breach of contract, including vertical editing and horizontal editing errors.

59    Regarding Mr. Conning's claims for breach concerning the CCLD, CJKI asserts:

(i)    that it is justified in refusing to accept File 1 and File 2 because they did not conform to the applicable standards;

(ii)   that it owed no duty to have negotiations take place between specific employees and Mr. Conning;

(iii)  that CJKI's offer for a new agreement was made to salvage the situation and was not wrongful;

(iv)   that regarding the late payment of US$5,000, damages were already compensated by the addition of late payment interest of 6% per annum;

(v)    that the third and other files were not provided because File 1 and File 2 contained a significant amount of errors and Mr. Conning did not complete his work on those files; and

(vi)   that CJKI's instructions provided were adequate.

60    Regarding Mr. Conning's claims concerning the Apps, CJKI asserts that Mr. Conning failed to finish creating the content of the KLC App, and did not provide any data or specifications for the HLC App.

61    CJKI further asserts that:

(i)    the suspension of work was enacted for legitimate reasons;

    (ii)  CJKI was equally vested in the release of the Apps and therefore Mr. Conning's claim that CJKI used the Apps as leverage is false; and

    (iii)  CJKI fulfilled its duties relating to the Apps, and the five-month timeframe for CJKI's development work did not begin because Mr. Conning did not provide complete contents.

62    With regard to Mr. Conning's demand for compensation, CJKI asserts that it should not be obliged to pay for the development costs of the Apps because such development cannot be regarded as compensation for the editing work of the CCLD, development of the Apps by third-party could not be performed without copyright permission by CJKI and differs fundamentally from CJKI's development obligations, and the basis of calculation and claimed amounts are excessive.

## CJKI's Counterclaim

63    Regarding the CCLD, CJKI assesses the value of Mr. Conning's uncompleted work to be US$12,188.80, and therefore considers the remaining amount to be paid to Mr. Conning for his remaining work after subtracting the US$5,000 already paid to be US$7,188.80.

64    Furthermore, due to Mr. Conning's breach of editing obligations, CJKI asserts that it suffered loss of profits of JPY3,000,000 and additional damage including to correct deficient work of JPY2,000,000 at the very least.

65    With regard to the Apps, CJKI asserts that it had proceeded with the development of the KLC App as best as possible and that it could release the KLC App within one or two weeks if Mr. Conning provides completed data, which submission the Tribunal is requested to enforce.

## Remedy Sought

66    Based on the foregoing, CJKI initially sought seven items as relief, but pursuant to its Request for Amendment, confirmed that it now sought the following relief:

    (i)  An award to confirm that the amount CJKI should pay to Mr. Conning for his work on the CCLD in accordance with the Consulting Agreement does not exceed US$7,188.80;

(ii) An award for JPY5,000,000 for the damage caused by Mr. Conning, which consists of damages for the delay in releasing the CCLD and damages due to Mr. Conning's working methods, provided that the amount in item (i) should be offset against the one in item (ii) in the Sole Arbitrator's decision;

(iii) An award to force Mr. Conning to submit the complete content data of the KLC App to CJKI by the deadline the Sole Arbitrator thinks appropriate; and

(iv) A decision that all the costs of the arbitration including but not limited to the administrative fee, the arbitrator's remuneration and expenses and both parties' legal fees and expenses to the extent the Sole Arbitrator determines that they are reasonable should be borne by Mr. Conning.

## IV    ISSUES TO BE DETERMINED

67    The following list of issues is based on the List of Major Issues as agreed by the Parties. The Sole Arbitrator considered these issues as required for purposes of its determination.

## Interpretation of the Consulting Agreement

68    **Issue 1 (Priority Issue):** What was the scope of Mr. Conning's editing duties under the Consulting Agreement?

Sub-Issues:

(i) In order to determine Issue 1, is it necessary to consider documents other than the Consulting Agreement itself? If yes, what are the documents?

(ii) In the context of the Parties' agreement, what is the meaning of "vertical editing" and what specifically does it involve?

(iii) In the context of the Parties' agreement, what is the meaning of "proofreading"? Are there any steps such as sending back the files to "Horizontal Editors" or provision of "Proof" before Mr. Conning gets to "proofreading"?

(iv) Was there any obligation on Mr. Conning to carry out (a) any horizontal editing; or (b) "final" editing?

(v) What were the deadlines for Mr. Conning's work submissions?

Case 1:18-cv-12336-ADB   Document 4   Filed 11/12/18   Page 100 of 120
Case 1:18-cv-12336   Document 1-2   Filed 11/07/18   Page 55 of 71

Page 17

69    **Issue 2**: What was the scope of Mr. Conning's contractual obligations in relation to the KLC App and the HLC App?

70    **Issue 3**: What was the scope of CJKI's contractual obligations in relation to the KLC App and the HLC App?

      Sub-Issue:

      (i)    Was CJKI obliged to provide Mr. Conning with technical assistance and data processing services in order to help him complete the content for the KLC app?

71    **Issue 4**: Were CJKI's obligations in relation to the HLC and KLC Apps intended to be a form of remuneration for Mr. Conning's editing work on CCLD?

## Editing Work on the CCLD

72    **Issue 5**: What was the standard of quality that Mr. Conning's work was required to meet in light of Paragraph 2.1 of the Consulting Agreement?

73    **Issue 6**: Was the work performed to the standard required by the Consulting Agreement, including whether Mr. Conning abided by any delivery deadlines?

74    **Issue 7**: Did CJKI evaluate the work fairly and reasonably?

## The KLC and HLC Apps

75    **Issue 8**: Did Mr. Conning fulfil his obligations under the Consulting Agreement with regard to the KLC App?

76    **Issue 9**: Did CJKI fulfil its obligations under the Consulting Agreement with regard to the KLC App?

77    **Issue 10**: Which Party was responsible for obstructing progress on the KLC App (and, by extension, the HLC App)?

## Termination of the Consulting Agreement

78    **Issue 11**: Has the Consulting Agreement been terminated and, if so, has this occurred based on the termination by Mr. Conning on March 1, 2016, or the partial termination by CJKI on August 8, 2016?

      Sub-Issue:

(i)   May the Consulting Agreement be regarded as separable with respect to CJKI's claim for termination of the CCLD portion thereof?

## Quantum of Loss

79   **Issue 12**: What is the scope and quantum (including what is the appropriate way to evaluate monetary value) of loss suffered by the injured Party/Parties?

## V   DISCUSSION AND DECISION

80   As noted above, the Parties stipulated that the Sole Arbitrator shall issue an award without reasons pursuant to Rule 61.3 of the Rules. But for good measure, and as agreed with the Parties, the Sole Arbitrator hereby sets forth its abbreviated reasoning outlining its determination process. The above issues have been considered as required for purposes of rendering this award, but have not necessarily been set forth herein issue by issue.

## Editing Work on the CCLD

### *Scope of Duties, Standard of Quality, and Performance*

81   The Sole Arbitrator carefully considered the documentary record, submissions, and witness statements provided by both Parties.

82   The Sole Arbitrator first considered the central issue in dispute as to whether the editing work on the CCLD performed by Mr. Conning, including the work conducted on File 1 and File 2, breached his duties under the Consulting Agreement, and the other issues relating thereto (Issue 1, Issue 5, Issue 6).

83   First, in determining the scope of Mr. Conning's editing duties (Issue 1), the contractual language set forth in the Consulting Agreement is of primary importance. Because the agreement makes specific reference to "vertical editing" in the descriptive phrase "his main task includes but is not limited to editing ('vertical editing')," the focus of Mr. Conning's duties must be understood to have been "vertical editing." This interpretation is supported by the pre-contractual negotiations between the Parties during which Mr. Halpern offered Mr. Conning to "consider the possibility of a large project involving 'horizontal' editing as well," which offer Mr. Conning declined as consuming too much time. Ex. C-23. Also in light of the above understanding of Mr. Conning's primary task as well as

Case 1:18-cv-12336-ADB   Document 4   Filed 11/12/18   Page 102 of 120
Case 1:18-cv-12336   Document 1-2   Filed 11/07/18   Page 57 of 71

Page 19

Mr. Halpern's appreciation of Mr. Conning's specific linguistic skills in hiring him for the job, the term "proofreading" in Mr. Conning's work description cannot be interpreted to include "horizontal editing;" and in absence of any specific contractual language Mr. Conning cannot be regarded as assuming the role of "final" editor.

84   Next, with regards the standard of quality required of Mr. Conning's work (Issue 5), the agreement requires Mr. Conning to employ "best efforts" when performing his duties while "striving to attain high standards of quality." The Sole Arbitrator understands these terms in their plain language meaning as to require a high level of diligence, including devotion of time and effort, in seeking to fulfill the quality expected considering the nature of the editing work for the CCLD project and Mr. Conning's particular skill set.

85   Based on the foregoing understanding of Mr. Conning's obligations, the Sole Arbitrator considered the work he conducted under the Consulting Agreement. In this regard, the contemporaneous correspondence between the Parties and documentary evidence indicates that CJKI expressed positive feedback with respect to Mr. Conning's vertical editing work. Notably, Ms. Tajima in an e-mail on November 5, 2004, praised Mr. Conning's vertical editing work stating that "the way you put together the core meanings and literal meanings is so well done," and Mr. Halpern's e-mail of September 5, 2014, states that "core meanings are good and in general you have strong shprachgeful and know what you are doing," Ex. C-41, Ex. C-31. Furthermore, following the submissions of File 1 and File 2, Mr. Halpern is found to have sought to persuade Mr. Conning to sign a contract amendment by indicated CJKI's willingness to pay Mr. Conning "the highest rates paid to translators of the most difficult languages in the most difficult technical domains." Ex. C-132. These facts indicate that CJKI viewed Mr. Conning's work as satisfactory.

86   In rebuttal, CJKI does not focus on addressing the contemporaneous correspondence, but rather provides detailed excerpts of alleged errors found in Mr. Conning's submissions, asserting that the quality of his work submitted was insufficient. Having carefully considered this evidence and both Parties' assertions, the Sole Arbitrator noted that (i)among the 10 error reports from which the alleged errors were collected, three were from the pre-contract Experiment (R-80, R-81 and R-82) and three were feedback on the draft version of File 1 (R-83, R-84 and R-85), which facts

considerably diminish the evidentiary value of the reports, (ii) the principal proportion of CJKI's asserted errors related to "horizontal" editing which the Sole Arbitrator determined was not Mr. Conning's responsibility, and (iii) many of the alleged "vertical" editing errors involve subjective judgment and cannot be regarded as decisive "errors" in light of CJKI's contemporaneous correspondence praising Mr. Conning's vertical editing work generally. . In light of these factors and the significant evidentiary value of the contemporaneous correspondence noted above, CJKI's evidence is insufficient to overcome the presumption that Mr. Conning's work was deemed to be satisfactory.

*CJKI's Fair Evaluation*

87    The Sole Arbitrator next considered whether CJKI evaluated Mr. Conning's work fairly and reasonably and whether CJKI breached its contractual obligations as asserted by Mr. Conning regarding the CCLD project (issue 7).

88    In this regard, the correspondence between the Parties indicates that CJKI repeatedly barred communications between Mr. Conning and CJKI employees from April 14, 2014, suspended work on the Apps, and sought to amend the Consulting Agreement in CJKI's favor, during which process CJKI threatened to abandon the Consulting Agreement and delayed the first payment of US$5,000 for eight months to pressure Mr. Conning to agree to an unfavorable amendment. The Sole Arbitrator finds that such conduct breaches CJKI's explicit and implicit obligations under the Consulting Agreement, including its obligation to accept Mr. Conning's work upon a fair and reasonable evaluation, and to provide sufficient instructions and additional data for editing.

89    CJKI asserts that the significant amount of errors in Mr. Conning's work forced CJKI to decide whether to terminate the Agreement or reduce Mr. Conning's remuneration by amending the agreement. But CJKI does not sufficiently explain why it was willing to continue to engage Mr. Conning in the same vertical editing work under the proposed amendment and to pay him the high rates as noted above. CJKI also faults Mr. Conning for sending lengthy, repetitive e-mails, but such conduct is insufficient to justify CJKI's actions to cease to abide by its contractual obligations.

90    The Sole Arbitrator therefore finds CJKI to be in breach of its obligations under the

Agreement and responsible for frustrating Mr. Conning's work on the CCLD.

## The KLC and HLC Apps

### Scope of Obligations

91   The Sole Arbitrator next considered the scope of the Parties' obligations in relation to the HLC App and KLC App (Issue 2, Issue 3), whether the Parties fulfilled their obligations (Issue 8, Issue 9) and which Party was responsible for obstructing progress on the Apps (Issue 10).

92   The Parties generally agree that Mr. Conning's role was to create "the content" of the Apps, whereas CJKI's role was "developing" the Apps, including attending to the specific tasks set forth in the Consulting Agreement.[4]

93   The principal point of contention is whether the tasks requested by Mr. Conning in May 2015 set forth in Ex. R-104 (the "Data Processing Requests") which CJKI refused to process fall under CJKI's obligations. Given the broad, inclusive language defining CJKI's non-exhaustive list of development tasks, and the Parties' mutual understanding of their roles based on their respective expertise, the Sole Arbitrator finds that these tasks, which include formatting, auto conversion and other tasks that would generally be expected to be conducted by a software development company rather than the content creator, fall under CJKI's obligations.

94   CJKI asserts in reliance on Mr. Mettifogo's testimony that these tasks fall under Mr. Conning's obligation. Mr. Mettifogo's assessment, however, is contradictory to his earlier assessment which appears in correspondence with Mr. Conning on June 7, 2015, where he indicates that CJKI was willing to undertake those requests, as "a free service . . . Under no obligation." Ex. C-137. The fact that CJKI was capable and ready to undertake such tasks at that time supports the view that they were development tasks forming part of the obligations of CJKI and not Mr. Conning.

---

[4]   Appendix 2 relating to the KLC App states that Mr. Conning is "fully responsible for . . creating the content of the" App (para. 2) and "conceptualizing, researching, structuring, writing and editing the content" of the App (para. 9) and CJKI was responsible for "developing the IKLC App" (para. 1), including a number of enumerated tasks, including "solving many technical problems, debugging the system, managing outside consultants and related tasks." (para. 10).

### Fulfillment of Obligations and Obstruction

95    Based on this understanding of the Parties' obligations, Mr. Conning is found to have performed his principal obligations for the KLC App by submitting a draft data file for 2300 characters of the Kanji Learner's Course on June 23, 2014, which finds support in an e-mail from Mr. Halpern stating that June 20, 2014, would be the "official starting date" which triggers the five month timeline for development under the Agreement.[5] Ex. C-73.

96    Conversely, CJKI is found to have breached its obligation to develop the App because it put the development work on hold in August 2014, Ex. C-108, and further blocked communications regarding the Apps between Mr. Conning and its employees. The reasons given by CJKI for such suspension, including that Mr. Conning did not communicate properly and failed to perform certain principally horizontal editing duties on the CCLD, do not provide sufficient legal bases for such suspension. CJKI is thus found to be in breach of the Consulting Agreement.

### Termination of the Consulting Agreement

97    Because CJKI is found to have been in breach, the Sole Arbitrator finds that the Consulting Agreement was successfully terminated by Mr. Conning on March 1, 2016, upon delivery of his Reply to Counterclaim to CJKI (Issue 11). The Sole Arbitrator cannot accept CJKI's assertion that CJKI partially terminated the CCLD portion of the agreement on August 8, 2016, given that the entire agreement was terminated earlier by Mr. Conning.

### Quantum of Loss

98    The Sole Arbitrator next considered the scope and quantum of loss suffered by Mr. Conning, including the appropriate way to evaluate the monetary value of such loss (Issue 12).

99    The Parties disagree as to the appropriate method to quantify Mr. Conning's loss. In this regard, the court in the Japanese Supreme Court case of February 22, 1977,[6] held that where the contractor's work in a construction (ukeoi) agreement could not be

---

[5]    Mr. Halpern also confirmed "[o]f course we have already done a lot of work and don't expect the work to take the five months cited in the contract." Id.

[6]    31-1 Minshu 79.

completed because the hiring party obstructed the contractor's work, the contractor is entitled to the full amount of the stipulated compensation, minus the economic benefits retained by the contractor from not having to complete the work.

100   Applying this standard to the instant case, the Sole Arbitrator first considered Mr. Conning's assertion that the remaining "stipulated" compensation of Mr. Conning consisted of (i) US$30,000 of unpaid compensation and (ii) the value of CJKI's assistance in developing the Apps. CJKI argues that the development of the Apps should not be regarded as forming part of compensation of the editing work of the CCLD. Because the language of the Agreement explicitly states that the revenue arrangements for the App are "an integral part of this compensation agreement"[7] and the pre-contractual negotiations between the Parties reveal that CJKI's obligations to develop the Apps formed a strong incentive in Mr. Conning's decision to undertake the CCLD project, the Sole Arbitrator finds that the development of the Apps should be considered part of Mr. Conning's remuneration (Issue 4).

101   With regards the value of CJKI's assistance in developing the Apps and the Parties disagreement regarding the appropriate method to determine its monetary value, the Sole Arbitrator agrees with CJKI that the expected revenue stream to be generated by the Apps (as apportioned to Mr. Conning in accordance with the Agreement's provisions) would generally be regarded as a reasonable measure of valuation.

102   On the other hand, Mr. Conning's alternate proposed valuation measure based on third-party vendor quotations may also be reasonably be taken into account, since it provides an objective measure compared to assessing an expected revenue stream based on projected sales of a product that was never completed. But Mr. Conning's assessment of US$543,333 for the KLC App based on vendor quotations for development is excessively high as it assumes development by a vendor lacking linguistic expertise and considering Mr. Conning's initial claim of US$67,000 for development costs as stated in his Request as well as other evidence, including Mr. Conning's US$22,583 assessment of CJKI's internal development costs which appears

---

[7]   Paragraph 3 of Exhibit CCLD states "As an integral part of this compensation agreement, the parties agree to a revenue sharing scheme for the smart platform apps described in Appendixes 1 and 2."

in a modified agreement proposal exchanged between the Parties.  Ex. R-140.[8]

103   In rebuttal, CJKI asserts that US$1,365 would be the expected annual sales projection for the KLC App as a best case scenario.  But CJKI's assertion lacks a clearly articulated basis and cannot be regarded as reasonable since it would not cover CJKI's expected development costs via the revenue allocation scheme.

104   Given the Sole Arbitrator's wide discretion in assessing damages, the Sole Arbitrator took all the foregoing into account, as well as both Parties' assertions and the entire record to determine the entire monetary value of Mr. Conning's loss, accounting for (i) the US$30,000 of unpaid compensation, appropriately reduced to take account of "the benefits retained Mr. Conning" for submitting only two of the five intended files for the CCLD project and the US$5,000 payment already received, (ii) the reasonable value of CJKI's assistance in developing the KLC App, appropriately reduced on account of "the benefits retained Mr. Conning" for not having to conduct the additional work to complete the KLC App, and (iii) the reasonable value of CJKI's assistance in developing the HLC App, appropriately reduced on account of "the benefits retained Mr. Conning" for not having to conduct the work required to develop and complete the HLC App.

105   Based on all of the foregoing, the Sole Arbitrator finds that the monetary value of Mr. Conning's total loss should be assessed at US$50,000.

**CJKI Counterclaim**

106   The Sole Arbitrator next considered CJKI's counterclaims.

107   Based on the above findings, because Mr. Conning is not found to be in breach of the Consulting Agreement, no basis is found to award CJKI's claim for relief to confirm that the amount CJKI should pay to Mr. Conning for his work on the CCLD in accordance with the Consulting Agreement does not exceed US$7,188.80.  And for the same reason, CJKI's claim of JPY5,000,000 for damage caused by Mr. Conning must also be denied.

108   Finally, because the Consulting Agreement is found to have been terminated by

---

[8]   The Sole Arbitrator also considered the quotations submitted by CJKI provided by a Vietnamese and Japanese companies (Ex. R-128 and Ex. R-129) as well as the issues with such quotations asserted by Mr. Conning.

Case 1:18-cv-12336-ADB   Document 4   Filed 11/12/18   Page 108 of 120
Case 1:18-cv-12336   Document 1-2   Filed 11/07/18   Page 63 of 71

Page 25

Mr. Conning for breach of contract, CJKI's request for an award to force Mr. Conning to submit the complete content data of the KLC App to CJKI is also denied.

## Late Payment Interest

109   The Tribunal further finds that late payment interest shall accrue on the awarded amounts at the statutory rate of six percent (6%) pursuant to Arts. 514 and 502(2) of the Japanese Commercial Code.

## Costs of Arbitration

110   The Sole Arbitrator next considered the allocation of costs of the arbitration.

111   As to whether to include the Parties' legal fees and expenses in the apportionment of costs, the Sole Arbitrator determined in its discretion that it would maintain its view that such legal fees and expenses shall not be included as part of the apportionment of costs in light of the relatively limited size of the dispute as well as the Parties' conduct in the proceedings.

112   With respect to the allocation of the remaining costs, under Rule 83.2 of the Rules, the Sole Arbitrator "may apportion the costs under Rule 83.1 between the Parties, taking into account the Parties' conduct throughout the course of the arbitral proceedings, the determination on the merits of the dispute, and any relevant circumstances."

113   Having considered the above factors, in particular the fact that Mr. Conning prevailed in his claims, but taking into consideration the proportion of his claim that was awarded, the Sole Arbitrator determined that the costs of the arbitration, including the administrative fee, the arbitrator(s)' remuneration and expenses" shall be apportioned between the Parties 20% to Mr. Conning and 80% to CJKI.

114   The specific costs and their allocation shall be as set forth in the attached Calculation Sheet (Exhibit A).

**AWARD**

115  Further to the above, the Sole Arbitrator:

(i)  AWARDS AND DIRECTS that CJKI shall pay Mr. Conning the sum of US$50,000, with interest thereon at the rate of 6% per annum from March 2, 2016, until the date of full payment thereof;

(ii)  AWARDS AND DIRECTS that CJKI shall pay Mr. Conning the sum of JPY1,779,718 in respect of costs of arbitration; and

(iii)  REJECTS all other requests and claims made by both Parties.

Place of Arbitration:  Tokyo (Japan)

Date of Award:  February 13, 2017

Douglas Kenji Freeman
Sole Arbitrator

**Exhibit A**

## CALCULATION SHEET

| Arbitration Fee and others | Amount to be borne by Mr. Conning | Amount to be borne by CJKI |
|---|---|---|
| 1. Administrative fee: JPY923,810 | JPY184,762 (20%) | JPY739,048 +) JPY59,123 (consumption tax*) JPY798,171 (80%) |
| Administrative fee (Counterclaim) JPY201,440 | JPY40,288 (20%) | JPY161,152 +)12,892 (consumption tax*) JPY174,044 (80%) |
| 2. Arbitrator's remuneration: JPY3,497,616 | JPY699,523.2 (20%) | JPY2,798,092.8 +)JPY223,847 (consumption tax*) JPY3,021,939.8 (80%) |
| 3. Arbitrator's expenses: JPY3,898 | JPY779.6 (20%) | JPY3,118.4 (80%) |
| JPY4,626,764 | JPY925,352.8 | JPY3,997,273.2 |

① Administrative fee including consumption tax JPY73,905 paid by Mr. Conning to the JCAA:                                JPY997,715

② Administrative fee (Counterclaim) including consumption tax JPY16,115 paid by CJKI to the JCAA:                       JPY217,555

③ Deposit paid by Mr. Conning to the JCAA:                  JPY2,000,000

④ Deposit paid by CJKI to the JCAA:                         JPY2,000,000

⑤ Amount to be borne by Mr. Conning:                   JPY925,353 (round up)

⑥ Amount to be borne by CJKI:                          JPY3,997,273 (round off)

⑦ Amount to be paid by CJKI to Mr. Conning:           JPY1,779,718 (②+④-⑥)

⑧ Amount to be refunded from the JCAA to Mr. Conning:   JPY292,644 (①+③-⑤-⑦)

* 8% Consumption Tax on the person residing in Japan.

Exhibit B

# CONSULTING AGREEMENT

This Agreement is made, entered into and effective as of the April 10, 2014 ("the effective date"), between The CJK Dictionary Institute, Inc. ("the Company"), a Japanese corporation with its place of business at a corporation of Japan, having a principal address at Komine Building, 2-chome 34-14, Tohoku, Niiza-shi, Saitama 352-0001, Japan and Andrew Scott Conning residing at Holden Green 203-C, Cambridge, MA 02138 USA ("the Consultant").

WHEREAS the Company has certain rights and knowledge and information in the field of language dictionaries and linguistics; and

WHEREAS the Consultant desires to undertake various duties related to language-related consulting and editing work;

NOW, THEREFORE, the Company and the Consultant (each a "party" and collectively "the parties") hereby agree as follows:

## 1.    Responsibilities of Company

1.1    The Company shall provide the Consultant with dictionary data and other kinds of data, programs, and/or documentation as necessary to the Consultant fulfill his obligations under this Agreement. This, along with the Work and documentation created by the Consultant under this Agreement, are referred to as "Company Data."

1.2    The Company shall provide the Consultant with instructions and/or specifications as necessary for the Consultant to fulfill his obligations under this Agreement. This may take the form of documents or instructions in oral or written form.

## 2.    Responsibilities of Consultant

2.1    The Consultant shall make his best efforts to perform his duties specified in the Exhibit while striving to attain high standards of quality, and to properly understand and follow instructions.

2.2    The Consultant will be responsible for management, track-keeping and maintenance of his work and keeping track of the time worked.

2.3    The Company Data constitutes valuable intellectual property of the Company. The Consultant will use his best efforts to protect the Company's data from unauthorized disclosure and illegal copying.

## 3.    Copyrights and Representation Rights

3.1    All copyright and any other ownership rights in the Company Data, as well as data, texts and documents produced by the consultant, shall remain the sole property of the Company.

3.2    The Company warrants that it has full title to the Company Data and the authority transfer such data to the Consultant.

3.4    The Consultant shall not be deemed to be an employee, agent, nor legal representative of the Company.

## 4. Term of Agreement and Termination

4.1    The initial term of this Agreement shall be for a trial period of two months from the effective date. This is a trial period to determine the performance of the Consultant and the quality of his work.

4.2    If the trial period is completed successfully, the term of this Agreement shall be extended until the obligations of the Company (payment) and the Consultant (the Work) parties as defined in the Exhibit are completed.

4.3    This Agreement may be terminated in case of poor performance or in case of a violation of this Agreement by the Consultant, especially in case of a major violation. In case of termination, the Company shall pay the Consultant the consulting fee specified in the Exhibit(s) up to the day that consulting services were provided.

4.4    Upon termination, the Consultant shall return to the Company all Company Data and purge all copies thereof from the Consultant's computers.

4.5    Any dispute or claim arising out of this Agreement shall be settled by binding arbitration in Tokyo, Japan in accordance with the Commercial Arbitration Rules of the Japan Commercial Arbitration Association.

4.6    Section 5 shall survive termination of this Agreement.

## 5. Confidential Information and Nondisclosure

5.1    "Confidential Information" shall mean any information, whether communicated orally or by way of written document, regarding the technical design or costs of the products or services of the Company, information regarding the operations and trade secrets of the Company, the Company Data, and any nonpublic information relating to the Company's product or business plans. The Consultant shall not disclose any confidential information to third parties without the Company's written permission.

5.2    The Consultant may not license, sell or make available the Company Data to third parties, and shall take sufficient care to ensure that the data is not leaked to the public. Non-compliance with this clause shall be considered a serious violation of this Agreement.

## 6. Integration of Agreement

This Agreement constitutes the entire agreement between the parties and supersedes any other preliminary discussions, whether oral or written, between the parties.

7.    General Provisions

This Agreement includes the "Exhibit", "Appendix 1: IOS Apps", and "Appendix 2: App development phases" annexed hereto, which are considered as if incorporated herein. This Agreement constitutes the entire understanding of the parties as to any matter contained herein and may not be modified orally. Modifications to this Agreement can only be made in writing, signed by both parties to this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the dates indicated below.

The CJK Dictionary Institute, Inc.

Signature

Jack Halpern, CEO
Signed on: April 10, 2014

Andrew Scott Conning

Signature

Andrew Scott Conning

Signed on:  April 10, 2014

# Exhibit: CCLD

## 1. The Work

The Consultant shall make his best efforts to perform his duties ("the Work"). His main task includes but is not limited to editing ("vertical editing") and proofreading of The CJKI Chinese Learner's Dictionary ("CCLD") and related tasks, as well consulting by phone, in person or by email on linguistic issues and related tasks as deemed necessary by the Company. The Work will be based on such documents as "hy_ASC-1-2.xls (Instructions A tab)" and "hy_compile.txt", as well as email and phone consultation (the Specifications").

A secondary task is to provide a reasonable amount of consulting that includes small writing tasks and reviewing documents such has academic papers as well as giving advice on app development. For major jobs such as the writing of academic papers, a consulting fee will be negotiated separately.

## 2. Acceptance

"Acceptance" means that the Company judges the work to be in compliance with the requirements as set out in various specification documents, including informal documents such as email exchanges,

## 2. Delivery Schedule

The Consultant will formally begin the Work on the effective date of this Agreement, and complete the Work by August 31, 2014 or by three months of receiving the final batch of pre-edited data from the Company, whichever is later. The Consultant will make his best efforts to complete the Work by the date given. In special circumstances and by mutual agreement, the final delivery of edited data can be extended to October 31, 2014.

If problems are discovered in the Data submitted by the Consultant after the delivery date, the Consultant will continue to revise the Work until it meets the requirements for acceptance.

## 3. Compensation

The Company will pay the Consultant a total of US$35,000 in the manner specified below. An advance on royalties to the amount US$5000 will be paid within 60 days of the effective date, but no later than June 1, 2014. An additional advance of US$5000 will be paid within 30 days of acceptance.

On the assumption that the work is accepted by the Company, the Company will pay the consultant a royalty of 10% of the net amount received by the Company on sales of the print and mobile app editions of CCLD. After the grand total of all royalties paid to the Consultant reaches a sum of US$25,000, the payment of royalties to the Consultant will be terminated. Payments of royalties will be made on a quarterly basis, within 30 days that the payments are received by the Company.

As an integral part of this compensation agreement, the parties agree to a revenue sharing scheme for the Kanji\Hanzi Learner's Course mobile apps described in Appendix 1.

## 3. Expenses

The Company will pay the Consultant reasonable expenses required for his services, including applications downloaded for research, travel expenses for occasional trips to the Company, books and the like. The Consultant shall notify the company before making a purchase that costs more than US$50.

## 4. Tax Deductions

4

The Consultant declares that he is responsible for declaring his income as a result of his consulting services. No tax deductions will be made from payments made by the Company.

## 5. Work Hours

The Consultant shall endeavor to work for approximately 12-15 hours per week on average. Though there are no set working hours, the Consultant shall endeavor to occasionally make himself available for phone consultation, which may occur during Company work hours (9am to 6pm) or in the evenings or weekends Japan time.

5⁵

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only) Andrew Scott Conning v. Jack Halpern, et al.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local rule 40.1(a)(1)).

   ☐ I. 410, 441, 470, 535, 830*, 835*, 891, 893, 895, R.23, REGARDLESS OF NATURE OF SUIT.

   ☐ II. 110, 130, 140, 160, 190, 196, 230, 240, 290,320,362, 370, 371, 380, 430, 440, 442, 443, 445, 446, 448, 710, 720, 740, 790, 820*, 840*, 850, 870, 871.

   ☑ III. 120, 150, 151, 152, 153, 195, 210, 220, 245, 310, 315, 330, 340, 345, 350, 355, 360, 365, 367, 368, 375, 376, 385, 400, 422, 423, 450, 460, 462, 463, 465, 485, 490, 510, 530, 540, 550, 555, 625, 690, 751, 791, 861-865, 890, 896, 899, 950.

   *Also complete AO 120 or AO 121. for patent, trademark or copyright cases.

3. Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
   YES ☐    NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)
   YES ☐    NO ☑
   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
   YES ☐    NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
   YES ☐    NO ☑

7. Do all of the parties in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
   YES ☐    NO ☑

   A. If yes, in which division do all of the non-governmental parties reside?
      Eastern Division ☐    Central Division ☐    Western Division ☐

   B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
      Eastern Division ☑    Central Division ☐    Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)
   YES ☑    NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME Tara J. Myslinski, Sean T. Carnathan
ADDRESS 1 Van De Graaff Drive, Suite 104, Burlington, MA 01803
TELEPHONE NO. 781-359-9000

(CategoryForm9-2018.wpd )

## PENDING MOTIONS IN STATE COURT:

### Conning v. Halpern et al., Middlesex Superior Court 1881-cv-02831

1) Plaintiff's Motion for Approval of Attachment on Trustee Process (hearing currently scheduled for November 8, 2018)

JS 44 (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Andrew Scott Conning | Jack Halpern and CJK Dictionary Institute, Inc. |

**(b)** County of Residence of First Listed Plaintiff    Alameda, CA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Japan
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Kenneth L. Parker, Shaun P. Keough, Nathaniel J. Lichtin
Parker Keough, LLP, 51 Winchester St, Suite 205, Newton, MA 02461
617-841-2418

Attorneys *(If Known)*
Tara J. Myslinski, Sean T. Carnathan
O'Connor, Carnathan and Mack, LLC
1 Van De Graaff Drive, #104, Burlington, MA 01803, 781-359-9000

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☐ 3   Federal Question *(U.S. Government Not a Party)*
- ☐ 2   U.S. Government Defendant
- ☒ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*       *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☒ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product |    Product Liability | |    28 USC 157 |    3729(a)) |
| ☐ 140 Negotiable Instrument |    Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & |    Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
|    & Enforcement of Judgment |    Slander |    Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' |    Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted |    Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
|    Student Loans | ☐ 340 Marine |    Injury Product | |    New Drug Application | ☐ 470 Racketeer Influenced and |
|    (Excludes Veterans) | ☐ 345 Marine Product |    Liability | | ☐ 840 Trademark |    Corrupt Organizations |
| ☐ 153 Recovery of Overpayment |    Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
|    of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending |    Act | ☐ 862 Black Lung (923) |    Protection Act |
| ☐ 190 Other Contract |    Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal |    Property Damage |    Relations | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise |    Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) |    Exchange |
| | ☐ 362 Personal Injury - |    Product Liability | ☐ 751 Family and Medical | | ☐ 890 Other Statutory Actions |
| |    Medical Malpractice | |    Leave Act | | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of Information |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee |    Income Security Act |    or Defendant) |    Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☒ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ |    Sentence | |    26 USC 7609 | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability |    Accommodations | ☐ 530 General | | |    Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | |    Agency Decision |
| |    Employment | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | |    State Statutes |
| |    Other | ☐ 550 Civil Rights |    Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | |    Conditions of | | | |
| | |    Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Sec. 1332(a)

Brief description of cause:
Defendants seek to remove plaintiff's action filed in state court to confirm and enforce Int'l arbitration award

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
246,221.91

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☒ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE             DOCKET NUMBER

DATE
11/07/2018

SIGNATURE OF ATTORNEY OF RECORD
/s/ Tara J. Myslinski, /s/ Sean T. Carnathan

**FOR OFFICE USE ONLY**

RECEIPT #       AMOUNT       APPLYING IFP       JUDGE       MAG. JUDGE

JS 44 Reverse (Rev. 08/18)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.)**

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.