UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ANDREW SCOTT CONNING, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | No. 1:18-cv-12336-ADB |
| JACK HALPERN and CJK DICTIONARY INSTITUTE, INC., | * | |
| | * | |
| Defendants. | * | |
| | * | |

## **MEMORANDUM AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS**

BURROUGHS, D.J.

Plaintiff Andrew Scott Conning ("Conning") brings claims against Defendants Jack Halpern ("Halpern") and CJK Dictionary Institute ("CJKI") for defamation (Count I), tortious interference with a business relationship (Count II), violation of Massachusetts General Laws Chapter 93A ("Chapter 93A") (Count III), and enforcement of an arbitration award obtained through proceedings before the Japan Commercial Arbitration Association ("JCAA") (Count IV). The parties have had a lengthy and less than fully amicable business relationship. The most recent chapter began in 2014 when Conning agreed to help CJKI develop applications to teach customers Chinese and Sino-Japanese characters. [ECF No. 1-2 at 14–37 ("Complaint" or "Compl.") ¶¶ 16–17]. The relationship deteriorated, and Conning pursued arbitration against CJKI, which concluded on February 13, 2017 in an award of $50,000 plus costs and interest to Conning. Compl. ¶¶ 18, 24–27. Conning claims that, after paying only part of the arbitration award, Halpern and CJKI engaged in coercive, defamatory, and unfair and deceptive conduct to damage his business relationships and dissuade him from pursuing the full amount due. Compl. ¶¶ 26, 43, 54–61.

On September 28, 2018, Conning filed this lawsuit in Middlesex Superior Court. See Compl. at 23. Defendants removed the action, entered a special appearance, and now move to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). [ECF Nos. 1, 7, 8]. For the reasons explained below, the motion to dismiss is DENIED.

I. BACKGROUND

This summary draws from allegations in the Complaint and from attestations in the affidavits proffered by the parties. See A Corp. v. All Am. Plumbing, Inc., 812 F.3d 54, 58 (1st Cir. 2016) (stating that plaintiffs bear the burden of establishing specific jurisdiction and it is "not enough . . . to 'rely on unsupported allegations in [its] pleadings'" (citation omitted)).

The plaintiff, Andrew Scott Conning is domiciled in Massachusetts, although he now temporarily resides in California. Compl. ¶ 1. Defendant CJKI is a Japanese corporation, and Defendant Jack Halpern resides in Japan. Compl. ¶¶ 2, 4; [ECF No. 8-1 ("Halpern Aff.") ¶ 3]. CJKI specializes in Chinese, Japanese, and Korean lexicology (hence "CJK") and develops dictionaries and associated applications that are hosted by third parties and may be downloaded from almost anywhere. Halpern Aff. ¶ 2.

On April 10, 2014, Conning and CJKI entered into a consulting agreement (the "Consulting Agreement"). [ECF No. 17-1 ("Conning Aff.") ¶ 7].[1] Conning agreed to help edit CJKI's Chinese Learner's Dictionary, and CJKI agreed to collaborate on the development of an application to teach a course that Conning had developed on Chinese and Sino-Japanese characters. Compl. ¶ 17. Defendants initiated and conducted the negotiations that led to the Consulting Agreement through email and Skype communication with Conning, who they knew

---

[1] The parties' overall business relationship dates to at least December 10, 2007, when CJKI licensed certain of its works to Conning's publisher. [ECF No. 8-1 ("Halpern Aff.") ¶ 5].

lived and would work from Massachusetts. Conning Aff. ¶¶ 6, 9. The Consulting Agreement provided that any dispute arising out of the agreement would be subject to binding arbitration before the JCAA. Compl. ¶¶ 18–19.

Consistent with the parties' expectations, Conning performed his obligations under the Consulting Agreement in Massachusetts, and CJKI sent payment to Conning in Massachusetts. Conning Aff. ¶¶ 10–12. Defendants also sent hundreds of emails to Conning in Massachusetts, but neither Halpern nor any other representative for CJKI visited Massachusetts in connection with the parties' relationship, except for attorneys seeking to resolve the ensuing dispute. See Conning Aff. ¶¶ 19, 23.

CJKI did not hold up its end of the Consulting Agreement, and on December 21, 2015, Conning requested arbitration before the JCAA. Compl. ¶ 18. On March 1, 2016, the arbitrator ruled that CJKI had violated its explicit and implicit obligations to Conning and had inappropriately withheld compensation from Conning to force him to amend the Consulting Agreement. Compl. ¶¶ 20–21. Conning was awarded $50,000 and the costs of arbitration. Compl. ¶¶ 24–25. Although CJKI paid a substantial portion of the award and costs in 2017, CJKI still owes a balance of more than $30,000. Compl. ¶¶ 26–29.

Following the arbitral award, Defendants pressured Conning to abandon his right to the full amount due by making false statements to Kodansha International and Kodansha USA, Inc. (together "Kodansha"), who were to publish and distribute his book: *The Kodansha Kanji Learner's Course: A Step-by-Step Guide to Mastering 2300 Characters*. Compl. ¶ 31; Conning Aff. ¶ 25. Specifically, Halpern told Kodansha that Conning's book made unauthorized use of CJKI's proprietary data and that Conning no longer had permission to use a foreword that Halpern had written for the book. Compl. ¶¶ 31–42. Conning maintains that he did not misuse

3

any proprietary data and that Halpern had willingly provided the foreword. Compl. ¶¶ 35–36.
The Kodansha employees who received these statements included Kodansha Marketing Director
Laura Shatzkin, who Conning attests has visited Massachusetts. Conning Aff. ¶ 28. The
statements harmed Conning's reputation in Massachusetts and caused Kodansha to forgo the
opportunity to publish and distribute his book, resulting in a loss of royalties. Conning Aff.
¶¶ 25, 27–29.

Defendants referenced their purported sway over Kodansha in emails to Conning in
Massachusetts that were intended to pressure him to settle for less than the arbitral award. For
example, Halpern wrote in one May 2018 email that if Conning accepted his proposal to resolve
their dispute, he would tell the Kodansha officials who were "very unhappy with the copyright
issue." Conning Aff. Ex. 12.[2] Conning has not identified any communications sent to
Massachusetts that were themselves defamatory or that damaged Plaintiff's relationship with
Kodansha or any other potential business partners.

Aside from its relationship with Conning, Defendants' contacts with Massachusetts have
been limited. CJKI licensed certain of its works (*i.e.* foreign language dictionaries) to
Massachusetts persons other than Conning on two occasions,[3] and Halpern has traveled to
Massachusetts twice. Halpern Aff. ¶ 9. In addition to these targeted contacts, CJKI uploads
products to third-party venders, who may then sell the products in Massachusetts. Halpern Aff.

---

[2] The May 2018 email appears to be a pragmatic and good-faith effort to resolve the parties' dispute. The tone appears professional and optimistic about the potential for resolution without litigation, although it ends with a prediction that artificial intelligence will end civilization as we know it. See Conning Aff. Ex. 12.

[3] One of CJKI's previous contractual relationships with a Massachusetts entity resulted in litigation in the District of Massachusetts. Halpern was not a party to that litigation, although he submitted at least five affidavits to the Court in connection with it. See Basis Technology Corp. v. CJK Dictionary Institute, Inc., No. 1:03-cv-10870 (D. Mass.), Dkt. Nos. 6, 7, 17, 39, 43.

¶ 2. CJKI and Halpern make no efforts to specifically market their products in Massachusetts, and they do not own property in the Commonwealth. Halpern Aff. ¶¶ 2, 4.

## II. STANDARD OF REVIEW

Plaintiffs bear the burden of establishing that specific jurisdiction exists over each Defendant. A Corp., 812 F.3d at 58 (citing Phillips v. Prairie Eye Ctr., 530 F.3d 22, 26 (1st Cir. 2008)). When a district court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, the "prima facie" standard governs its determination. United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001). Under the prima facie standard, plaintiffs must proffer "evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction." A Corp., 812 F.3d at 58 (quoting Prairie Eye Ctr., 530 F.3d at 26). "[P]laintiffs may not rely on unsupported allegations in their pleadings," and are instead "obliged to adduce evidence of specific facts." Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 134 (1st Cir. 2006) (first quoting Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st Cir. 1992), then quoting Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 145 (1st Cir. 1995)). The Court takes as true whatever properly documented facts a plaintiff proffers, construes those facts in the light most favorable to the plaintiff, and considers facts put forward by the defendants to the extent they are uncontradicted. See Prairie Eye Ctr., 530 F.3d at 26; Platten, 437 F.3d at 134.

## III. JURISDICTION

The Due Process Clause of the Fourteenth Amendment allows state courts to exercise jurisdiction over a nonresident only where the exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (citations omitted). "To establish personal jurisdiction in a diversity case, a

5

plaintiff must satisfy both the forum state's long-arm statute and the Due Process Clause of the Fourteenth Amendment." C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., 771 F.3d 59, 65 (1st Cir. 2014) (citing Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 204 (1st Cir. 1994)).

Here, the Court's jurisdiction, or lack thereof, rests on the conduct that led to Conning's defamation and tortious interference claims, which also serve as the basis for his Chapter 93A claim. See Compl. ¶¶ 105–106. Conning also brings a claim to enforce the arbitral award that he obtained before the JCAA, but because Defendants do not own property in the Commonwealth, the Court lacks *quasi in rem* jurisdiction over any assets that could be used to satisfy the arbitral award. See Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co., 284 F.3d 1114, 1127–28 (9th Cir. 2002) (holding that the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards and the Federal Arbitration Act "authorize the exercise of subject matter jurisdiction but not personal jurisdiction," but that "[p]ersonal jurisdiction must be based on a defendant's person or property"); CME Media Enterprises B.V. v. Zelezny, No. 01 CIV. 1733, 2001 WL 1035138, at *4 (S.D.N.Y. Sept. 10, 2001) (extent of jurisdiction to enforce arbitral award limited by assets that were before the Court). As such, the Court's jurisdictional analysis is limited to whether Defendants' Massachusetts contacts confer personal jurisdiction over the tort claims asserted.

### A. Massachusetts Long-Arm Statute

"[T]he long-arm statute imposes specific constraints on the exercise of personal jurisdiction that are not coextensive with the parameters of due process." SCVNGR, Inc. v. Punchh, Inc., 85 N.E.3d 50, 52 (Mass. 2017); see also Cossart v. United Excel Corp., 804 F.3d 13, 18 (1st Cir. 2015) ("The requirements of . . . the Massachusetts long-arm statute . . . are similar to—although not necessarily the same as—those imposed by the Due Process Clause."

6

(citations omitted)).  The Massachusetts long-arm statute provides, in part, "A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's . . . transacting any business in this commonwealth . . . ."  Mass. Gen. Laws ch. 223A, § 3(a).

"The 'arising from' clause in [the long-arm statute] is . . . generously construed in favor of asserting personal jurisdiction, by applying a 'but for' causation test."  Workgroup Tech. Corp. v. MGM Grand Hotel, LLC, 246 F. Supp. 2d 102, 112 (D. Mass. 2003).  "[A] claim arises from a defendant's transaction of business in the forum State if the claim was made possible by, or lies in the wake of, the transaction of business in the forum State."  Access Now, Inc. v. Otter Prods., LLC, 280 F. Supp. 3d 287, 291 (D. Mass. 2017) (quoting Tatro v. Manor Care, Inc., 625 N.E.2d 549, 553 (Mass. 1994)).  The arising from inquiry asks "[d]id the defendant's contacts with the Commonwealth constitute the first step in a train of events that result[ed] in the . . . injury."  Id. (quotation marks omitted) (quoting Lyle Richards Int'l, Ltd. v. Ashworth, Inc., 132 F.3d 111, 114 (1st Cir. 1997)).  "[T]he defendant's involvement need not be major, as 'just a few acts on [his] part can often suffice to satisfy [subsection 3(a)]'s threshold for transacting business.'"  Scuderi Grp., LLC v. LGD Tech., LLC, 575 F. Supp. 2d 312, 319 (D. Mass. 2008) (quoting Workgroup Tech. Corp., 246 F. Supp. 2d at 110).  Although subsection 3(a) of the long-arm statute "has been construed broadly," Tatro, 625 N.E.2d at 551 (citations omitted), the test "is designed to identify deliberate, as distinguished from fortuitous, contacts with the forum by the nonresident party," Lyle Richards Int'l, 132 F.3d at 112. "[A]n isolated (and minor) transaction with a Massachusetts resident may be insufficient, [but] generally the purposeful and

7

successful solicitation of business from residents of the Commonwealth, by a defendant or its agent, will suffice to satisfy this requirement." Tatro, 625 N.E.2d at 551–52.

Here, subsection 3(a) of the Massachusetts long-arm statute is satisfied. The dispute between the parties stems from Defendants' successful solicitation of Conning's services and their negotiation of the Consulting Agreement. Cf. Ouellette v. True Penny People, LLC, 352 F. Supp. 3d 144, 152 (D. Mass. 2018) (finding jurisdiction under subsection 3(a) based on an employment agreement negotiated over phone and email, while plaintiff was in the Commonwealth, for services that would be rendered in the Commonwealth). Conning's claims all lie in the wake of the Consulting Agreement, which led to arbitration, which was followed by increased animosity, and eventually the alleged defamatory statements and interference with business relationships that are at issue here. Because the Court concludes that Conning's claims arise from the Defendants transacting business in the Commonwealth within the meaning of subsection 3(a) of the Massachusetts long-arm statute, it need not address Conning's assertion that Defendants' conduct also comes within subsections (b) and (d) of the long-arm statute. See [ECF No. 17 at 9–10].[4]

### B.     Constitutional Due Process

In addition to the long-arm statute, the Court must also determine whether it can exercise jurisdiction consistent with the requirements of the Due Process Clause of the Fourteenth Amendment. Courts may exercise two types of personal jurisdiction under the Fourteenth

---

[4] Subsections (b) and (d) of the long-arm statute provide that "[a] court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's . . . (b) contracting to supply services or things in this commonwealth; [or] . . . (d) causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth . . . ." Mass. Gen. Laws ch. 223A, § 3.

8

Amendment: general or specific. "[G]eneral jurisdiction requires affiliations 'so "continuous and systematic" as to render [a person] essentially at home in the forum State.'" Daimler AG v. Bauman, 571 U.S. 117, 133 n.11 (2014) (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011)). In Daimler AG, the Supreme Court explained that with respect to a corporate defendant, "the place of incorporation and principal place of business are paradig[m] . . . bases for general jurisdiction." 571 U.S. at 137 (quotation marks and citation omitted). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." Goodyear Dunlop Tires Operations, 564 U.S. at 924. Here, Halpern and CJKI are at home in Japan, not Massachusetts. The jurisdictional inquiry therefore requires a finding that this Court can exercise specific personal jurisdiction over the Defendants.

A plaintiff seeking to establish specific jurisdiction must show that each of three conditions is satisfied:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must . . . be reasonable.

Adelson v. Hananel, 510 F.3d 43, 49 (1st Cir. 2007) (quoting Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 60 (1st Cir. 2002)). "Failure to make any one of these showings dooms any effort to establish specific personal jurisdiction." Scottsdale Capital Advisors Corp. v. The Deal, LLC, 887 F.3d 17, 20 (1st Cir. 2018).

1. **Relatedness to the Forum**

"The relatedness standard is a 'flexible, relaxed standard,' which focuses on the 'nexus between the defendant's contacts and the plaintiff's cause of action.'" Adelson, 510 F.3d at 49 (first quoting Pritzker v. Yari, 42 F.3d 53, 61 (1st Cir. 1994), then quoting Ticketmaster-N.Y., 26

9

F.3d at 206 (1st Cir. 1994)). "The relatedness prong requires the plaintiff to show 'a demonstrable nexus between [its] claims and [the defendant's] forum-based activities, such ... [that] the litigation itself is founded directly on those activities." C.W. Downer, 771 F.3d at 66 (quoting Adelson, 652 F.3d at 81)).[5]

In tort cases, where the defendant causes plaintiff to suffer an injury in the forum state, the nexus requirement may be satisfied even if it was not physically present there. See Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 9 (1st Cir. 2009) (holding that a defendant "need not be physically present in the forum state to cause injury" and thus have forum-state contacts for jurisdictional purposes (quoting N. Laminate Sales, Inc. v. Davis, 403 F.3d 14, 25 (1st Cir. 2005))). The fact that a plaintiff suffers injury in the forum state, however, does not alone satisfy the relatedness prong because "what matters most is the *defendant's* relation to the forum, not the place of the plaintiff's injury." Gulf Oil Ltd. P'ship v. Petroleum Mktg. Grp., 308 F. Supp. 3d 453, 460 (D. Mass. 2018) (emphasis in original); see also A Corp., 812 F.3d at 60 (1st Cir. 2016) (finding indirect effect of out-of-state injury caused by out-of-state conduct insufficient to satisfy the relatedness prong). The effects of intentional torts in the forum state may suffice to satisfy the relatedness requirement where intentional conduct was expressly aimed at the forum state and caused harm the defendant knew would likely be suffered there. See Calder v. Jones, 465 U.S. 783, 789 (1984). This "effects" test is commonly applied in intentional

---

[5] Although C.W. Downer & Co. v. Bioriginal Food & Science Corp., 771 F.3d 59, 66 (2014), and Adelson v. Hananel, 652 F.3d 75, 81 (1st Cir. 2011), say that the relatedness prong requires that the litigation itself be "founded directly" on defendant's "forum-based" activities, C.W. Downer and Adelson concerned contract disputes, and their articulation of the relatedness test applies less neatly in intentional tort cases. Where a defendant fires a proverbial bullet into the forum-state, jurisdiction is surely proper even if the defendant's actions are, in a sense, based elsewhere. See Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 10 (1st Cir. 2009); N. Laminate Sales, Inc. v. Davis, 403 F.3d 14, 25 (1st Cir. 2005).

10

tort cases where the defendant's allegedly tortious conduct caused harm in the forum state, although the defendant did not set foot there. See e.g., id.; Astro-Med, 591 F.3d at 10 (finding "conduct in Florida and California was a cause of the breach of contract—the actual injury—that occurred in Rhode Island[, and t]hat in-forum injury was clearly related to [plaintiff's] tortious interference claim, satisfying the first prong of the minimum contacts analysis"); N. Laminate Sales, 403 F.3d at 25 ("injury in New Hampshire incurred as a result of [defendant's] alleged tortious activity in New York could provide the basis for jurisdiction in New Hampshire").[6]

Here, the relatedness prong presents a close question. Conning's claims primarily arise from Defendants' alleged defamation of Conning and interference with his business relationships with Kodansha. The alleged defamation and interference torts occurred through communications between Halpern in Japan and Kodansha employees outside Massachusetts. Nevertheless, Halpern's emails to Conning in Massachusetts show that Defendants sought to leverage their relationship with Kodansha to pressure Conning into settling for less than the arbitral award. Defendants surely understood that the effect of alleging that Conning was misusing their data and Halpern's foreword would include economic and reputational effects on Conning in Massachusetts. Additionally, viewing the evidence in the light most favorable to Conning, the communications to Kodansha were part of a broader scheme to deprive Conning of the economic benefit of the Consulting Agreement, which concerned work performed in Massachusetts and the

---

[6] Emails sent into a forum-state state may satisfy the relatedness prong, even absent other forum-state contacts, where their content and effect are the basis for the claims at issue. See Micro Estimating Sys., Inc. v. Laurentec, LLC, No. 12-cv-30107-MAP, 2013 WL 1330996, at *4 (D. Mass. Mar. 29, 2013) (assuming without deciding that forwarding a single email to a company in Massachusetts was sufficient to satisfy the relatedness prong where its contents were at issue in the lawsuit); First Act, Inc. v. Brook Mays Music Co., 311 F. Supp. 2d 258, 260–61 (D. Mass. 2004) (finding relatedness requirement satisfied where defendant sent one email to sixty Massachusetts residents and that email formed the basis of the lawsuit).

benefit of which was by then represented by the arbitration award. Defendants were therefore targeting the effect of their conduct towards Massachusetts and the alleged torts closely relate to their contacts with the Commonwealth.

Defendants emphasize the relatively weak "causal nexus" between their contacts with Massachusetts and the tort claims asserted. See [ECF No. 20 at 2]. The First Circuit has noted that mere "in-forum effect[s] of [ ] extra-forum [torts are] inadequate to support a finding of relatedness." Phillips Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 289 (1st Cir. 1999); see also Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 35 (1st Cir. 1998) (stating that for tort claims, courts "customarily look to whether the plaintiff has established" but for cause of injury "and legal cause (i.e., the defendant's in-state conduct gave birth to the cause of action)"). Defendants further argue that this case is analogous to LockeBridge, LLC v. GGMS Media, Inc., No. CIV.A. 11-12252-DJC, 2012 WL 2370114, at *8 (D. Mass. June 22, 2012), where the district court found that the relatedness requirement did not support causes of action that arose out of a general business relationship that involved various emails and phone calls with the plaintiff in Massachusetts.[7] Consistent with the "effects" test established by the Supreme Court in Calder v. Jones, 465 U.S. 783, 789 (1984), the First Circuit has, however, found the relatedness prong satisfied where defendants knowingly caused forum-state injury through tortious interference, even where defendants sent no relevant communication into the forum state. See Astro-Med, 591 F.3d at 10. This effects test was not applied by LockeBridge.

---

[7] LockeBridge, LLC v. GGMS Media, Inc., No. CIV.A. 11-12252-DJC, 2012 WL 2370114 (D. Mass. June 22, 2012), considered the relatedness prong without evaluating whether the effects of the tortious act or the relation between defendants' forum-state contacts and the causes of action could satisfy the relatedness prong, instead stating that "in-forum conduct must cause the plaintiff's injury or give rise to the claims." Id. at *8 (citing Sawtelle v. Farrell, 70 F.3d 1381, 1389 (1st Cir. 1995)).

See 2012 WL 2370114, at *8–10. Here, the Court finds that the relatedness prong is satisfied, albeit barely, under the test articulated by Calder and considering the First Circuit's decisions in Astro-Med, Inc. v. Nihon Kohden America, Inc., 591 F.3d at 10 (1st Cir. 2009), and Northern Laminate Sales, Inc. v. Davis, 403 F.3d 14, 25 (1st Cir. 2005).

### 2. Purposeful Availment

Purposeful availment "represents a rough quid pro quo: when a defendant deliberately targets its behavior toward the society or economy of a particular forum, the forum should have the power to subject the defendant to judgment regarding that behavior." C.W. Downer, 771 F.3d at 66 (quoting Carreras v. PMG Collins, LLC, 660 F.3d 549, 555 (1st Cir. 2011)). "The cornerstones of this inquiry are voluntariness and foreseeability." Id. (citing Daynard, 290 F.3d at 61). "This places the emphasis on the defendant's intentions and prohibits jurisdiction based on 'random, fortuitous, or attenuated contacts.'" Id. (citing Carreras, 660 F.3d at 555). "[T]he forum-related contacts must be of such a nature that the defendant can reasonably foresee being haled into court there." Carreras, 660 F.3d at 555.

Here, Defendants negotiated the Consulting Agreement with Conning while he was in Massachusetts, obtained Conning's services in Massachusetts, and sent a payment for those services to Massachusetts. Although those actions all occurred in connection with the Consulting Agreement, in which the parties selected the JCAA as the appropriate forum, Defendants should have recognized that by entering into contractual negotiations and an agreement for services provided from Massachusetts, they could be compelled to appear in a Massachusetts forum. Defendants further deliberately targeted Massachusetts when they went after Conning's business relationships and reputation with the knowledge that the effects of their actions would be felt in Massachusetts. These actions made it foreseeable that Defendants would

13

be required to answer for the alleged intentional torts in Massachusetts. See Astro-Med, 591 F.3d at 10 (holding that known effects in the forum state made it foreseeable that defendant might be held accountable for its intentional torts there); N. Laminate Sales, 403 F.3d at 25 (same).

### 3. Reasonableness

The Court's exercise of personal jurisdiction over the Defendants will not be unreasonable. The First Circuit has explained that in considering the "reasonableness" prong, courts should assess the Gestalt Factors, which include:

> (1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies.

Sawtelle v. Farrell, 70 F.3d 1381, 1394 (1st Cir. 1995).

The first Gestalt factor does not weigh strongly for or against jurisdiction. The Defendants' burden of appearing will be significant, particularly relative to the extent of the damages that might reasonably be expected in this case.[8] The burden is not, however, "onerous in a special, unusual, or other constitutionally significant way." Bermudez v. Newlong Mach. Works, Ltd., 98 F. Supp. 3d 47, 55 (D. Mass. 2015).

The remaining four Gestalt factors favor jurisdiction. Although Massachusetts' interest in having this dispute adjudicated in the Commonwealth is limited given that the causes of action

---

[8] Conning attests that he is owed $30,861.91 for the unpaid arbitration award, $9,600 in lost wages, $5,760 in lost profits, and $200,000 in estimated lost profits, mental anguish, and tarnished reputation. Conning Aff. ¶ 24. There is no reason to believe that this Court can meaningfully assist Conning in recovering the arbitration award given that he has not identified any assets owned by Defendants in this district. To the extent the claim for $200,000 reflects estimated lost profits, it is highly speculative and appears to be calculated based on Conning's expected royalties, which assume a strong market for *The Kodansha Kanji Learner's Course: A Step-by-Step Guide to Mastering 2300*.

arise primarily from out-of-state communications between foreign persons, Massachusetts does have an interest in ensuring that foreign individuals who engage in business relationships with its citizens do not commit torts against them. See Adelson, 510 F.3d at 51 ("Massachusetts has a 'stake in being able to provide a convenient forum for its residents to redress injuries inflicted by out-of-forum actors.'" (quoting Daynard, 290 F.3d at 62)). Conning has a significant interest in convenient and effective relief, which this forum should offer, and there is not a clearly superior forum that will better promote the substantive social policies of the sovereigns involved. See id. ("[A] resident of the state, has an interest in bringing this action in Massachusetts, which weighs in favor of a finding of personal jurisdiction.").

## IV.  CONCLUSIONS

Accordingly, Defendants' motion to dismiss for lack of personal jurisdiction [ECF No. 8] is DENIED.

**SO ORDERED.**

June 18, 2019

/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE